# Illinois Official Reports

## Appellate Court

*People v. Petermon*, 2014 IL App (1st) 113536

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TIMOTHY PETERMON, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-3536 |
| Filed<br>Rehearing denied | September 10, 2014<br>October 20, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's multiple convictions for shooting one man and firing at, but missing, an off-duty police officer who happened upon the scene, defendant's convictions were reduced pursuant to the one-act, one-crime rule to one conviction for the attempted first degree murder of the man who was hit and one conviction for the attempted first degree murder of the off-duty officer, notwithstanding defendant's contentions that the eyewitness testimony was inconsistent and inaccurate, and that the State failed to prove beyond a reasonable doubt that defendant intended to kill the officer, since there was no basis to disturb the trial court's acceptance of the identification testimony as the trier of fact, and the trial court did not err in finding defendant had the requisite intent to kill the officer. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-9367; the Hon. Evelyn B. Clay, Judge, presiding. |
| Judgment | Affirmed; mittimus corrected. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Benjamin Wimmer, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Brad D. Dickey, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE HYMAN delivered the judgment of the court, with opinion. Presiding Justice Pucinski and Justice Mason concurred in the judgment and opinion.

## OPINION

¶ 1    Defendant Timothy Petermon shot and injured one man and shot at an off-duty police officer who came on the scene and was attempting to make an arrest. Petermon seeks to reverse his convictions for attempted first degree murder, aggravated discharge of a firearm, and aggravated battery, contending reasonable doubt exists. He contends that the shooting victim repeatedly changed his testimony as to who shot him, and the State's other two witnesses gave inaccurate and inconsistent descriptions of Petermon to the police immediately after the incident and incorrectly testified that they identified Petermon in a photo array. Petermon also contends that even if his other convictions stand, his conviction for attempted murder of the police officer should be reversed because the State failed to prove beyond a reasonable doubt that he intended to kill him. Alternatively, Petermon contends that if we affirm his conviction, the one-act, one-crime rule requires us to vacate all of his convictions except the two attempted murder convictions.

¶ 2    We affirm, as modified. The credibility of the eyewitnesses was a matter for the trier of fact to decide, and their testimony linking him to the shooting supported Petermon's conviction. Further, the trial court did not err in finding Petermon had the requisite intent to kill the off-duty police officer when he shot at him, even though he did not hit him despite his close proximity. Regarding the one-act, one-crime rule, the State concedes and we agree, the mittimus should be corrected to reflect two convictions for attempted first degree murder and the aggravated discharge of a firearm and aggravated battery convictions and sentences should be vacated.

¶ 3                              BACKGROUND

¶ 4    On the afternoon of March 29, 2008, Gary Riley, an off-duty police officer on his way to work, saw Petermon, Terrell Johnson, and a third man beating Kelvin Jemison in an alley on the south side of Chicago. Officer Riley then witnessed Petermon shoot Jemison; Riley reacted by pulling out his service weapon, announced himself as a police officer, and attempted to stop

the attack. Petermon shot at Riley, who returned the fire. Riley was unscathed. Following an investigation in which Riley, Jemison and a third eyewitness, Benjamin Smith, identified Petermon and Johnson as the perpetrators, the Chicago police arrested both men.

¶ 5    On May 20, 2008, an indictment issued charging Petermon with: (1) two counts of attempted first degree murder of a peace officer for shooting at Riley (720 ILCS 5/8-4, 9-1 (West 2008)) (counts I and III); two counts of attempted first degree murder for shooting at Riley (720 ILCS 5/8-4, 9-1 (West 2008)) (counts II and IV); three counts of attempted first degree murder for shooting Jemison (720 ILCS 5/8-4, 9-1(a)(1) (West 2008)) (counts V, VI, and VII); three counts of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2), (3) (West 2008)) (counts VIII, IX and X); one count of aggravated battery with a firearm (720 ILCS 5/12-4.2(a)(1) (West 2008)) (count XI); and four counts of unlawful use of a weapon (720 ILCS 5/24-1.1(a) (West 2008)) (counts XII, XIII, XIV, and XV).

¶ 6    Petermon waived his right to a jury trial and he and Johnson were tried together in March 2011. Riley, the State's first witness, testified he is a Chicago police officer and on March 29, 2008, at about 2 p.m., while on his way to work at central detention, he stopped at a dry cleaning store on 47th Street near Michigan Avenue. Riley wore plain clothes and carried his service revolver. When Riley got out of his pickup truck, he saw three men in an alley about 10 feet away beating up another man, Kelvin Jemison, who was on the ground. Riley said he saw Petermon first pistol-whip and then shoot Jemison. Riley testified he did not see anyone hand the gun to Petermon and he did not hear anyone tell Petermon to shoot. Riley announced himself as a police officer, shouted "stop," and drew his service weapon. Petermon then turned and shot the gun in his direction two or three times. Riley took cover behind his truck and returned fire two or three times. Riley did not know if he hit anyone. Riley then saw Jemison get up, stagger out of the alley, head east on 47th Street and collapse. Riley testified that Petermon, Johnson, and the other man got in a car and drove off.

¶ 7    Riley called 911 and when the police arrived, Riley told them what happened and described the perpetrators, telling the officers they were about 5 feet 10 inches tall and weighed 175 pounds. He also told the officers the shooter had on a red baseball cap and a red jacket. Later that day, Riley went to the police headquarters and viewed a photo array but did not identify any of the perpetrators. On cross-examination, Riley said that about a week after the shooting, he viewed a photo array and identified Petermon as the shooter. The State stipulated that Riley never viewed a photo array containing Petermon's photo and never identified him in a photo array.

¶ 8    On April 10, 2008, Riley returned to police headquarters and viewed a lineup. He identified codefendant Johnson as one of the men he saw standing over Jemison, beating him. The next day he viewed another lineup and identified Petermon as the shooter. Riley also made in-court identifications of Petermon and Johnson as the perpetrators.

¶ 9    The State's next witness, Benjamin Smith, testified that at about 2 p.m. that day, he was leaving a restaurant near 47th Street and Michigan Avenue when he saw three men in an alley about 10 feet away beating up another man. Smith did not recognize Jemison, the victim, but did recognize one of the perpetrators, Travell Johnson, not by name but as the son of "Pumpkin," who ran a restaurant in the neighborhood, where Smith sometimes saw Johnson. Smith did not know the other perpetrators but later identified Petermon in a lineup and in court. Smith said the three men were punching Jemison, who was trying to get away. Smith saw Johnson pull a gun out of his coat pocket, hand it to Petermon, and say "Shoot the

motherfucker." (On cross-examination, Smith testified Johnson actually said, "Shoot the son of a bitch.") Smith said he saw Petermon shoot Jemison a couple of times. (On cross-examination, Smith denied telling the police that Johnson shot Jemison or that he was unsure who shot Jemison.) Smith then saw an off-duty police officer get out of his car and identify himself. Smith said Petermon shot at the police officer twice and the officer shot back, firing about four times. Smith saw Jemison get up and run away and collapse at the corner of 47th Street and Indiana Avenue. The three perpetrators got in a car and drove off.

¶ 10 At about 4 p.m. on the day of the shooting, Smith went to police headquarters and viewed photo arrays. He did not identify anyone in the first photo array but identified codefendant Johnson in the second photo array. On April 11, Smith returned to police headquarters to view an in-person lineup. He identified codefendant Johnson and Petermon as the shooter. On cross-examination, Smith said that after the lineup, he identified Petermon in a photo array conducted at the police station but was unsure when the array was conducted or by whom. The State presented no evidence regarding whether this photo array identification occurred.

¶ 11 The State's third eyewitness, Kelvin Jemison, was in custody on the date he testified, after pleading guilty to unlawful use of a weapon by a felon. Jemison acknowledged he was initially charged as an armed habitual criminal and entered a plea agreement a few days earlier to the lesser charge and a three-year prison sentence. He stated he was not offered the plea deal in exchange for his testimony. Jemison acknowledged that before testifying, he met with two assistant State's Attorneys in the jury room to discuss what happened on the day he was shot. A bailiff and three police officers were in the jury room during the meeting.

¶ 12 Jemison, who was 23 years old on the day of the shooting, testified that he had been walking to a store with one of his friends when he got into an altercation with some men and got shot seven or eight times. Jemison said he was shot in the wrist, arm, legs, and face. He collapsed near Indiana Avenue and was taken to Northwestern Memorial Hospital. Jemison's testimony regarding who shot him was inconsistent. Initially, Jemison testified he did not know who shot him and said that the police officers who came to the hospital to talk to him "came at him with some names." He also said the police officers told him "it can go two ways," implying the officers were coercing him to identify Petermon as the shooter. Later, Jemison testified that on the day of the shooting, police officers came to the hospital and showed him a photo array and he identified Johnson as one of the men he was fighting with and Petermon as the man who shot him. He also testified that he told the officers he heard Johnson say, "We ain't got time for this, pop his ass." In court, Jemison identified Petermon as the shooter.

¶ 13 On April 10, 2008, Jemison was arrested on an unrelated matter and talked to detectives about the March 29 shooting. He said he told the detectives he got into an argument with Johnson over whether Jemison was permitted to walk on 47th Street, he fought with several men, and Petermon shot him.

¶ 14 On May 8, 2009, Jemison met with La Kenya White from the Chicago independent police review authority and told her about the fight and that Petermon shot him. Jemison said he told White he did not know if Johnson said "pop his ass," though he agreed he told her he heard someone say "pop his ass." Jemison said when he ran out of the alley he heard a man yell, "stop" but did not hear the man identify himself as a police officer. Jemison ran past the officer, heard two more shots, and then was shot in the back of the leg. Jemison said he told White he thought the police officer shot him.

¶ 15    On September 25, 2009, Jemison met with two private defense investigators. Jemison testified he gave the defense investigators conflicting stories, telling them that he did not know who shot him and that Petermon shot him. Then on October 19, 2009, Jemison went to the public defender's office and signed a statement recanting his earlier statements to the police. Jemison testified he could not remember if he had read the statement before signing it. Jemison acknowledged the account he gave to the defense investigators was different from the account he gave to the police, including his assertion that he did not know who shot him. Jemison said he gave the recantation statement to the defense investigators because he did not want to testify and that the statement was a lie.

¶ 16    Jemison stated that when he met with the assistant State's Attorneys in the jury room before testifying, he told them Petermon shot him and that before getting shot he heard someone say, "pop, shoot him." He told the assistant State's Attorney that he signed the recantation statement because he did not want to testify against Petermon and Johnson and had gotten into an argument with Johnson because Jemison "wasn't allowed" to be on 47th Street. Jemison said the friend he was with ran off and that he was fighting with Johnson until he heard gunshots and tried to shield himself.

¶ 17    On redirect examination, Jemison identified Petermon as the man who shot him. Before he was shot, he said he heard someone say, "I think we don't need this shit, pop his ass." Jemison then ran toward the police officer. Although he was running away from Petermon and toward the police officer, Jemison claimed he got shot in the back of the leg by the police officer.

¶ 18    Chicago police detective Samuel Brown was assigned to investigate the March 29, 2008, shooting and interviewed Jemison at Northwestern Hospital. Jemison told Brown that the person who shot him went by the name "T," "Timo," or "Tom-Tom." Jemison also told Brown that codefendant Johnson told the shooter, "We ain't got time for this shit, pop his ass." Chicago police detective Alan Szudarski went to Northwestern Hospital on the day of the shooting to show Jemison a photo array. Szudarski said Jemison identified in one of the photos the man he knew as "T" or "Timo."

¶ 19    Area One gang unit officer Thomas Tinsman, another police officer assigned to investigate the March 29 shooting, testified he found Petermon on April 11, 2008, hiding in a bedroom closet at home at 5942 South Emerald, Chicago, and arrested him.

¶ 20    Petermon did not testify.

¶ 21    The parties entered into three stipulations. First, they stipulated that if Officer Tinsman was called to testify he would state that at the time of Petermon's arrest, Petermon was 5 feet 11 inches tall and weighed 150 pounds, had black hair, and a dark brown complexion. Second, the parties stipulated that Riley never saw a picture of Petermon in a photo array and, therefore, never picked Petermon out of a photo array. Third, the parties stipulated that if called to testify, Chicago police detective Padilla would state that he spoke with Benjamin Smith on the evening of the shooting and that Smith described "Pumpkin's son" as 6 feet or 6 feet 1 inch, with a heavy build and popcorn braids and a white baseball cap and the other two offenders as 5 feet 7 inches or shorter wearing black hoodies. Padilla would also testify Smith told him he saw Pumpkin's son remove a gun from his pocket and fire at least two times before the police officer fired back. Smith later identified codefendant Johnson as Pumpkin's son and told Padilla he thought Johnson fired the shots but was not certain. On April 11, 2008, Smith gave a handwritten statement that when he told the officers codefendant Johnson had the gun, he

meant that Johnson had it first but was not the person who shot at the man they were beating up or who shot at the police.

¶ 22 After closing arguments, the trial court found the evidence of Petermon's guilt was "overwhelming" and convicted him on 11 of the 15 counts, including attempted murder of a police officer (counts I and III), attempted murder as to Riley (counts II and IV), attempted murder as to Jemison (counts V, VI, and VII), aggravated battery with a firearm as to Riley (count VIII), and aggravated discharge of a firearm at a peace officer (counts IX and X), and aggravated battery with a firearm as to Jemison (count IX). Petermon was acquitted on counts XII through XV, alleging unlawful use of a weapon by a felon.

¶ 23 On September 27, 2011, Petermon filed a motion for a new trial arguing, in part, that the State's witnesses offered contradictory testimony and were not credible, and that the State failed to prove him guilty beyond a reasonable doubt. After a hearing, the trial court determined that the State failed to prove beyond a reasonable doubt that Petermon knew Riley was a police officer when he fired the gun at him and so reversed the finding of guilt for attempted first degree murder of a peace officer (counts I and III) and the finding of guilt on the charges of aggravated discharge of a firearm in the direction of a peace officer (counts IX and X).

¶ 24 After hearing arguments in aggravation and mitigation, the trial court sentenced Petermon to 26 years for the attempted first degree murder of Riley (merging counts II and IV), 31 years for attempted first degree murder of Jemison (merging counts V, VI and VII), 4 years for aggravated discharge of a firearm (count VIII), and 6 years for aggravated battery as to Jemison (count XI), which would be served concurrently. The mittimus, however, incorrectly states Petermon was convicted on five counts of attempted murder, as well as one count of aggravated discharge of a firearm and one count of aggravated battery with a firearm. On November 4, 2011, Petermon filed a notice of appeal.

¶ 25                                                    ANALYSIS
¶ 26                                        Sufficiency of the Evidence
¶ 27 Petermon first argues his convictions should be reversed because the State failed to prove him guilty beyond a reasonable doubt. Specifically, Petermon contends the State's case relies almost exclusively on eyewitnesses, and the testimony of those witnesses was contradictory and inconsistent. Alternatively, he contends that if his other convictions are permitted to stand, his conviction for attempted first degree murder of Riley should be reversed because the State failed to prove beyond a reasonable doubt that he intended to kill Officer Riley.

¶ 28 In reviewing the sufficiency of the evidence to sustain a conviction on appeal, the court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Thomas*, 178 Ill. 2d 215, 232 (1997). We will not substitute our judgment for that of the trier of fact on the weight to be given the evidence or the credibility of the witnesses. *Thomas*, 178 Ill. 2d at 232. The trier of fact must "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

¶ 29        Because there was no physical evidence, no arrest at the scene, no admissions or statements by Petermon, and no evidence of gang affiliation or drug involvement, the primary issue is whether the eyewitness testimony supports a finding of guilt beyond a reasonable doubt.

¶ 30        The credibility of identification witnesses and the weight accorded their testimony lie within the province of the trier of fact. *People v. Curtis*, 262 Ill. App. 3d 876, 881 (1994). "Where the identification of defendant constitutes the central question in a criminal prosecution, the testimony of even a single witness is sufficient to convict where the witness is credible and viewed the accused under conditions permitting a positive identification to be made." *Id*. Although this court has occasionally reversed convictions that were supported by only "the uncorroborated testimony of a single eyewitness" (*People v. Hernandez*, 312 Ill. App. 3d 1032, 1037 (2000)), here three eyewitnesses testified to the shooting. Petermon contends, however, that we should ignore Jemison's testimony because it was contradictory, inaccurate, and unreliable, noting that the trial court, in ruling on his posttrial motion, described Jemison as "not credible." But even if we were to exclude Jemison's testimony, the other two eyewitnesses, Riley and Smith, establish Petermon's guilt beyond a reasonable doubt.

¶ 31        In evaluating the reliability of an eyewitness identification, Illinois courts rely on the five factors set forth by the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188 (1972). Those factors include: (1) the witness's opportunity to view the criminal at the time of the offense; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness when first identifying the defendant as the criminal; and (5) the length of time between the crime and the initial identification. *Id*. at 199-200; *People v. Hernandez*, 312 Ill. App. 3d 1032, 1036 (2000). Petermon contends the identifications were unreliable because the witnesses only had a short time to view the shooter, the witnesses' descriptions of the shooter were at odds with Petermon's actual appearance and each other, and the time between the shooting and the identifications was too long. We disagree.

¶ 32        Petermon first contends that, as Riley testified, the entire incident took less than a minute, which Petermon asserts was too quick to view the shooter and make an accurate identification. This court has previously rejected claims that the brevity of a witness's description undermines his or her identification testimony, though it can be a factor the trier of fact considers in weighing the testimony. See *People v. Parks*, 50 Ill. App. 3d 929, 932-33 (1977) (encounter as short as "five to ten seconds" held sufficient to support a conviction). Despite the brevity of the shooting incident, two eyewitnesses had a clear view of the shooter due to the conditions at the time–broad daylight–and the proximity of Riley and Smith to the shooter–about 10 feet. And one of the eyewitnesses, Smith, said he recognized both Petermon and his codefendant Johnson, whom he knew as "Pumpkin's son" and had recognized as someone he had seen in a restaurant in the neighborhood.

¶ 33        Moreover, both Riley and Smith gave similar, detailed descriptions of what they saw during the brief time, indicating a high degree of attention to the incident. Both witnesses described the fight in the alley and testified they saw one of the men, whom they later identified as Petermon, shoot Jemison. Smith also corroborated Riley's testimony that he announced himself as a police officer and was shot at before he returned fire. Riley and Smith also testified they saw Jemison get up and run out of the alley and collapse at the corner of 47th Street and Indiana Avenue and saw the perpetrators drive off in a car. Thus, although the entire

incident occurred quickly, the circumstances provided Riley and Smith the opportunity to view the shooter.

¶ 34     Petermon next contends Riley and Smith gave descriptions of the shooter that were at odds with Petermon's actual appearance, which suggests an inaccurate identification. When the police arrived at the scene, Riley described the offenders as 5 feet 10 inches tall and weighing 175 pounds. On the date of his arrest, Petermon was 5 feet 11 inches tall and weighed 150 pounds, which is not significantly different from Riley's description. On the other hand, as the parties stipulated, Smith told one of the police officers the shooter was 5 feet 7 inches tall or shorter and wearing a black hoodie. Although this description differs from Riley's and from Petermon's actual appearance, it does not necessarily render his identification unreliable. See *People v. Slim*, 127 Ill. 2d 302, 312 (1989) (noting discrepancies in descriptions of height and weight not decisive factors on review because few persons can make accurate estimations of those characteristics). Smith identified Petermon in a lineup photograph two weeks later. In addition, the trial court heard these discrepancies between Riley's and Smith's descriptions of the shooter, and between Smith's description and Petermon's actual appearance, weighed them accordingly, and found that positive identifications were made.

¶ 35     Finally, Petermon contends the time between the shooting and the identifications–about two weeks–supports his argument that the eyewitnesses were not credible. Our supreme court and the appellate court, however, have held that similar and even longer lapses between the crime and the identification are not significant. See *Slim*, 127 Ill. 2d at 313 (holding that lapse of 11 days is not significant); *People v. Rodgers*, 53 Ill. 2d 207, 214 (1972) (identification made two years after the crime); *People v. Malone*, 2012 IL App (1st) 110517, ¶ 36 (upholding identification made one year and four months after crime occurred).

¶ 36     We also note that Petermon suggests Riley's and Smith's identifications may have been compromised by seeing a photo of him before the lineup. At trial, Riley testified he identified Petermon in a photo array prior to the lineup, even though the State conceded Riley viewed no formal photo array. Smith testified that sometime after the lineup, he viewed a photo array containing two pictures and identified Petermon, even though the State presented no evidence of that photo array. Petermon asserts that showing the witness his picture would have been improper and could have unduly influenced the lineup identifications. If Petermon is suggesting his due process rights were violated because the State showed the eyewitnesses a photo of him before the lineup, he has forfeited this claim by failing to object at trial or raise the issue in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (failing to object at trial and raise issue in written motion for new trial results in waiver of issue on appeal).

¶ 37     If, however, as Petermon asserts in his reply brief, he is arguing that the eyewitness identifications are unreliable because they viewed a photo of him before the lineup, we note that Smith testified he saw a photo of Petermon *after* he identified him in a lineup. Thus, his viewing a photo of Petermon, whether in a formal photo array procedure or otherwise, could not have improperly influenced his identification of Petermon. As for Riley's testimony that he identified Petermon in a photo array, the parties stipulated that no photo array ever occurred. Defense counsel cross-examined both eyewitnesses regarding the alleged photo array identifications and the trial court was able to weigh the witnesses' credibility in light of the conflict between their testimony and the parties' stipulation.

¶ 38     As stated, it is the function of the trier of fact to resolve inconsistencies in the evidence and assess the credibility of the witnesses, the weight to be given their testimony (*People v. Cox*,

377 Ill. App. 3d 690, 697 (2007)), and the inferences to be drawn from it, and we will not substitute our judgment for that of the trier of fact. *People v. McCoy*, 295 Ill. App. 3d 988, 995 (1998). Defense counsel cross-examined the eyewitnesses regarding the issues raised by Petermon and argued during closing statements that the identifications were suspect for these reasons. The trial court, in performing its duties as the trier of fact, nevertheless accepted the witnesses' identifications, and we have no reason to disturb its findings.

¶ 39     Petermon next contends his conviction for attempted first degree murder of Riley should be reversed because the State failed to prove beyond a reasonable doubt that he intended to kill Riley. To support a conviction for attempted murder, the State must establish beyond a reasonable doubt that: (1) the defendant performed an act constituting a "substantial step" toward the commission of murder, and (2) the defendant possessed the criminal intent to kill the victim. *People v. Green*, 339 Ill. App. 3d 443, 451 (2003). " 'Intent is a state of mind which, if not admitted, can be established by proof of surrounding circumstances, including the character of the assault, the use of a deadly weapon, and other matters from which an intent to kill may be inferred. [Citations.] Such intent may be inferred when it has been demonstrated that the defendant voluntarily and willingly committed an act, the natural tendency of which is to destroy another's life.' " *Id.* at 451 (quoting *People v. Winters*, 151 Ill. App. 3d 402, 405 (1986)). Generally, the act of firing a gun, with nothing more, is not sufficient to prove intent to kill. *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001). But an intent to kill may be proven where the surrounding circumstances show that the defendant "fir[ed] *** a gun at or towards another person with either malice or a total disregard for human life." (Internal quotation marks omitted.) *Id.* This court has previously found that "[t]he very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill." (Internal quotation marks omitted.) *Id.* It falls to the trier of fact to determine if the requisite intent to kill existed, and that determination will not be disturbed on appeal unless there is a reasonable doubt as to defendant's guilt. *Green*, 339 Ill. App. 3d at 451.

¶ 40     Petermon claims that no rational trier of fact could have found that he intended to kill Riley because he was shooting at him from 10 feet away and did not hit him. He notes that Riley testified he only sought cover after shots were fired at him and thus was a perfect target. Petermon asserts, therefore, that the only reason he failed to strike Riley under those conditions is that he had no intent to kill Riley but was merely trying to keep him at bay while he and the other perpetrators escaped. Thus, he asserts, his convictions for the attempted murder of Riley should be reversed.

¶ 41     Petermon favorably cites *People v. Henry*, 3 Ill. App. 3d 235, 238-39 (1971). In *Henry*, the defendant was convicted of attempted murder for firing a handgun at an unmarked police car. *Id.* at 239. The shooting occurred on a dark night, as the defendant ran; the police car was 75 to 125 feet away. The appellate court found the evidence unclear regarding whether the defendant actually shot at the police car, and believed it to be unlikely that the defendant, who was an ex-marine with an expert rating in marksmanship, would miss the car had he aimed at it. *Id.* Accordingly, the court reversed the conviction.

¶ 42     Petermon contends that similarly he would not have missed Riley if he intended to kill him. *Henry* is distinguishable, however, due to the fact that Petermon, unlike Henry, was not a skilled shooter. Thus, it is plausible that even at such a close proximity he could fail to hit Riley even though he intended to. Further, in *Henry*, there was no evidence the defendant intended to shoot anyone; he fired toward an unmarked police car at nighttime from a distance of 75 to 125

feet as he was running away during a night of rioting in the city. Conversely, when Riley arrived on the scene, Petermon was beating Jemison and had shot him several times. When Petermon became aware of Riley's presence, he turned the gun he had just used to shoot Jemison onto Officer Riley.

¶ 43 This case is more analogous to *People v. Green*, 339 Ill. App. 3d 443 (2003), where the defendant, from a slow moving vehicle, fired four shots at undercover police officers who were sitting in a parked unmarked car. The defendant in *Green* made the same argument Petermon makes. "Specifically, Green argue[d] that had he intended to hit the officers, he could not possibly have missed at close range *** and the fact that no officer was struck is therefore sufficient to raise a reasonable doubt as to his intent to kill when he fired the shots." *Green*, 339 Ill. App. 3d at 451. In rejecting Green's argument, we explained that the defense "could reasonably argue that the fact that Green failed to strike the officers could support an inference that he lacked the intent to kill. However, that fact also supports the alternative inference that Green was simply unskilled and missed his targets. The decision as to which of competing inferences to draw from the evidence is the responsibility of the trier of fact." *Id*. at 451-52. See also *People v. Teague*, 2013 IL App (1st) 110349, ¶ 27 (holding evidence that defendant fired assault rifle at three police officers from 40 feet away sufficient to show intent to kill officers even if defendant failed to hit any of them; poor marksmanship not defense to attempted murder).

¶ 44 Although Petermon could have argued that his failure to hit Riley supported an inference that he lacked the intent to kill him, as in *Green*, the trier of fact also could draw instead the competing inference that Petermon was simply an unskilled shooter. Given that Petermon fired multiple shots at Riley, immediately after firing at and striking Jemison several times, and given that the well-established principle that this conduct is sufficient to support an attempted murder conviction, the trial court, as the trier of fact, did not err in finding the requisite intent to kill Riley. Thus, we affirm Petermon's convictions for the attempted murder of Riley.

¶ 45                                              One-Act, One-Crime Rule

¶ 46 Finally, Petermon contends even if his convictions are permitted to stand, this court should vacate all of his convictions other than those for attempted murder of Riley and Jemison, counts IV and VII, under the one-act, one-crime rule. The State agrees. Under the one-act, one-crime doctrine, a defendant may not be convicted of more than one offense for the same physical act and the "sentence should be imposed on the more serious offense and the less serious offense should be vacated." *People v. Artis*, 232 Ill. 2d 156, 170 (2009). Thus, Petermon's most serious offense as to each victim, attempted murder of Jemison and attempted murder of Riley, with sentences of 31 and 26 years, respectively, will be permitted to stand, and the remaining convictions, aggravated discharge of a firearm and aggravated battery will be vacated. This court has the authority to order the mittimus to be corrected without remanding. *People v. Mitchell*, 234 Ill. App. 3d 912, 921 (1992); Ill. S. Ct. R. 615(b)(1) (eff. Jan. 1, 1967). Accordingly, we direct the circuit clerk to correct the mittimus to reflect convictions for count IV, the attempted first degree murder of Gary Riley, which carries a sentence of 26 years and count VII, the attempted first degree murder of Kelvin Jemison, which carries a sentence of 31 years, with the sentences to be served concurrently.

## CONCLUSION

We affirm Petermon's convictions and order that the mittimus be corrected to reflect one conviction for attempted first degree murder of Riley and one conviction for attempted first degree murder of Jemison only. Accordingly, we affirm as modified the judgment of the trial court.

Affirmed; mittimus corrected.