2020 IL App (1st) 171263-U

No. 1-17-1263

Order filed April 17, 2020

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 12531 |
| | ) | |
| SERGIO GARCIA, | ) | Honorable |
| | ) | Erica L. Reddick, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE HOFFMAN delivered the judgment of the court.
Justices Rochford and Delort concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's convictions for five counts of attempted first degree murder affirmed where the State proved beyond a reasonable doubt that defendant, rather than another gunman, was the person who fired the gunshots at the victims.

¶ 2    Following a bench trial, defendant Sergio Garcia was convicted of five counts of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2014)) for firing gunshots at five separate victims. The trial court sentenced defendant to concurrent prison terms that totaled an aggregate sentence of 40 years' imprisonment. On appeal, defendant contends that the State failed to prove

him guilty beyond a reasonable doubt because it failed to prove that defendant, rather than another gunman, was personally responsible for firing the gunshots that established the charges of attempted first degree murder. We affirm.

¶ 3    Defendant was charged with 14 counts of attempted first degree murder, 2 counts of aggravated battery, and 3 counts of aggravated discharge of a firearm. At trial, Leo Bardo Rubalcava testified that shortly after noon on June 17, 2014, he and his girlfriend, Mallory Esquivel, were driving at the intersection of 98th Street and Avenue J when Rubalcava observed his godparents, Guadalupe Benavente and Angelica Prado, outside the front of their house with their sons, Reynaldo, Isaiah, and Santos Benavente. Rubalcava parked and exited his vehicle to say hello to the family. Esquivel remained inside the vehicle. Rubalcava approached the family and was speaking with them for about two minutes when a white-gray Impala pulled up followed by a red Blazer with black tinting in the rear. In the Blazer, one man was hanging outside the driver's window and another man was hanging out the rear passenger's window. In the Impala, a man was hanging outside the front passenger's window holding a gun in his right hand. The gunman in the Impala was no more than 15 to 20 feet from Rubalcava. Rubalcava could see the gunman's face with nothing obstructing his view. The gunman had the capital letters "L" and "D" tattooed on his forehead and another tattoo on his right cheek. He had a "shag" haircut and a tattoo on his dark skin. In court, Rubalcava identified defendant as the gunman inside the Impala.

¶ 4    Rubalcava was standing on the sidewalk with Angelica, Reynaldo, Isaiah, and Santos no more than two to three feet away from Rubalcava. Santos, who was two years old, was on a tricycle. Guadalupe had crossed the street. Defendant exited the Impala and pointed the gun at Rubalcava. Rubalcava heard gunshots and saw flashes of fire emitting from the gun. Rubalcava

turned around and ran towards the southeast side of the intersection. He heard more gunshots as he ran. Rubalcava looked back and observed defendant chasing him and shooting at him. Rubalcava felt a burning sensation on his left side near his ribcage and realized he had been shot. Rubalcava ran towards his truck, but reconsidered when he thought defendant would shoot him again as well as shoot his girlfriend. Rubalcava ran until he reached the alley at his godparents' house. He testified that their house is "right there" at the intersection of 98th Street and Avenue J, and that it is the only house on that block. Rubalcava ran to the front of his godparents' house, but did not enter the house because it was too hot and he was having difficulty breathing. He stood outside the house for no more than a minute, then sat on the ground because he could not stand any longer. Rubalcava observed that his shirt had a hole in it and was full of blood.

¶ 5    The paramedics arrived and transported Rubalcava to the hospital. Rubalcava suffered a gunshot wound to his ribcage that entered his left side, passed through his body, and exited his back. He underwent surgery during which his spleen was removed. Rubalcava's lungs were also damaged. He was hospitalized for a week to 10 days. He was discharged from the hospital with 50 to 60 stitches in his chest and an IV. Rubalcava has scars remaining on his side, back and chest from the gunshot wound and surgery.

¶ 6    After being discharged from the hospital, Rubalcava told police what happened. He viewed a photo array and identified defendant as the man who shot him. In court, Rubalcava identified photographs depicting the intersection where he was shot and his parked vehicle. His vehicle sustained bullet holes to the back and side windows, and the glass was shattered. Rubalcava also identified photographs depicting the entrance to his godparents' house where he laid on the ground with a pool of blood on the sidewalk, and Santos' tricycle parked in front of the house. Rubalcava

acknowledged that in 2010 he successfully completed a Cook County boot camp program for an arson charge.

¶ 7    On cross-examination, Rubalcava testified that there were three other people inside the Impala with defendant, the driver and two people in the backseat. One of the people in the backseat had a gun. Defendant fired his gun as soon as he exited the Impala. The second gunman started shooting immediately after defendant began shooting. Both gunmen were shooting at the same time. Rubalcava heard about 20 to 30 gunshots from the two guns. Defendant fired gunshots at Rubalcava while chasing him while the second gunman fired shots at Reynaldo as he fled across the street. When the shooting began, Angelica was standing no more than two to three feet from Rubalcava. Angelica also ran when the shooting started. The closest defendant came to Rubalcava while chasing him was about five feet, or two to three arm-lengths away. About 20 to 30 seconds passed from the time Rubalcava saw defendant hanging out of the Impala window until Rubalcava began running. Rubalcava testified that by the time he reached the door of his godparents' house in the middle of the block, defendant and the other gunman were reentering the Impala and driving away. Rubalcava acknowledged that on the day of the shooting or the day before he probably used marijuana and cocaine.

¶ 8    The night after Rubalcava was released from the hospital, a detective came to his house and interviewed him about the shooting. Rubalcava told the detective that he had previously seen the shooter around the neighborhood. On June 28, 2014, Rubalcava gave a written statement to two detectives and a prosecutor. Rubalcava acknowledged that his written statement did not indicate that he had previously seen the shooter in the neighborhood. He explained that the detective who wrote the statement never asked him that question, and if he had, he would have

provided him with the answer. He further testified that he had observed defendant once or twice in the neighborhood but did not know his name. Rubalcava spoke with Angelica and Reynaldo about the shooting, but they did not tell him that they told police that defendant was the shooter.

¶ 9     On redirect examination, Rubalcava testified that the tattoo on defendant's cheek was a cracked crown. Rubalcava observed only defendant and the second gunman with handguns. He did not observe anyone else at the scene with a gun, nor did he possess a gun that day.

¶ 10     Reynaldo testified that on June 17, he lived in a house near the intersection of 98th Street and Avenue J with his parents, Angelica and Guadalupe, and siblings, including his brothers Isaiah and Santos. Around noon, Reynaldo exited his house to walk to the store. His parents, Isaiah, and Santos were in front of the house near the garage. Santos was on his bicycle with his parents standing next to him, and Isaiah was standing near the fence waiting for Reynaldo. As Reynaldo and Isaiah began walking to the store, Rubalcava drove up in a vehicle with his girlfriend and parked near a tree towards the front of their house. Rubalcava exited his vehicle, approached Reynaldo, and asked how he was doing. Rubalcava stood next to Reynaldo on his right side, about an inch away from him. Isaiah stood next to Reynaldo on his left side. Angelica was standing in front of the house near the grass and the gate, and Santos was next to her.

¶ 11     Reynaldo heard a loud vehicle coming towards them. He looked to his left and observed a silver Impala stop at the stop sign at the intersection of 98th Street and Avenue J. The Impala was about two and a half feet from Reynaldo. Four Latino men were inside the vehicle. The man in the front passenger's seat exited the vehicle with a gun in his hand. He was about three feet from Reynaldo. Reynaldo had a clear view of the man's face. The man had tattoos of a capital "L" and "D" on his forehead. In court, Reynaldo identified defendant as that man.

¶ 12    Defendant aimed the gun in Reynaldo's direction. Reynaldo pushed Isaiah to the left. As Reynaldo turned to run he heard gunfire and screaming. He ran towards the front of his house, crossing the street at an angle towards the alley. As he ran, Reynaldo felt burns graze his right arm, left eye, and chest. Reynaldo heard a total of 10 gunshots. He did not observe anyone but defendant firing a weapon. When Reynaldo reached the alley, he no longer heard gunshots and stopped running. Reynaldo observed red marks similar to scars on his right forearm and chest, and felt a burning sensation in those locations. He also observed holes in the left leg of his jeans that were not there before the shooting. Reynaldo looked towards the intersection and saw the vehicle driving away heading east. Reynaldo went to the front of his house and saw that Rubalcava had been shot. Rubalcava was sitting on the ground with blood on his shirt. Angelica and Santos were also in front of the house.

¶ 13    When police arrived at the scene Reynaldo told them what happened and gave them a description of the gunman who exited the front passenger seat of the vehicle. Reynaldo accompanied the police to the station where he identified defendant in a photo array. Reynaldo recalled that when he was 8 or 10 years old, he saw defendant at a children's birthday party. Angelica's sister knew defendant's mother. Between the birthday party and the shooting, Reynaldo had no interaction with defendant. In court, Reynaldo identified the photo array he viewed when he identified defendant as "[t]he one that was shooting at me." Reynaldo also identified a photograph of the scene taken from the intersection which showed where he, Isaiah, Angelica, Santos, and Rubalcava were standing when defendant began shooting. Reynaldo acknowledged that he had a case pending for aggravated unlawful use of a weapon. He was not offered anything in regards to that case in exchange for his testimony in this case.

¶ 14     On cross-examination, Reynaldo acknowledged that he told a detective and an assistant state's attorney (ASA) that Angelica and defendant's mother were friends who attended school together. Angelica's sister attended classes with defendant's mother, and Angelica attended the same school but was in different classes. He did not know who defendant's mother was until he saw a photograph. About 10 or 11 years had elapsed from the day Reynaldo first met defendant until the day of the shooting. During that time, he saw defendant twice. At the time of the shooting, the closest distance defendant was from him was about two and a half feet. An in-court demonstration by counsel indicated that defendant and Reynaldo were about 10 feet apart. At that time, Reynaldo did not know who defendant was, nor did defendant look familiar to him. Reynaldo looked defendant in the face for two or three seconds before he ran. The description Reynaldo gave police of the shooter was a man with "LD" on his forehead in a silver four-door Impala with four other men inside the vehicle. Reynaldo did not tell police defendant's name, height or weight. Nor did he say that defendant was bald or 28 to 30 years old.

¶ 15     Reynaldo saw someone exit the rear driver's side seat of the Impala but did not see what that person did. He did not observe anyone else shoot a gun. When Reynaldo viewed the photo array, he recognized defendant's face as the man who was shooting at him. A detective mentioned defendant's name to Reynaldo, and Reynaldo then remembered who defendant was. He did not realize that he knew defendant until the detective told him his name. When Reynaldo returned home from the police station, he told his mother that he identified Sergio Garcia as the shooter. After Rubalcava was released from the hospital they discussed the shooting and Reynaldo told him that he identified the shooter in a photo array.

¶ 16     On redirect examination, Reynaldo testified that immediately before the shooting began, his attention was focused on defendant. He did not pay much attention to the person who exited the backseat on the driver's side of the vehicle. Reynaldo heard defendant's name after he identified him in the photo array. He did not know his name prior to the identification.

¶ 17     On re-cross examination, Reynaldo testified that he was under the influence of cannabis while testifying. On redirect examination, he testified that he did not know the meaning of the word "cannabis." He then testified that he did not use any illegal substances or alcohol in the 24 hours prior to his testimony. On re-cross examination, Reynaldo acknowledged that he had been arrested three times for possession of marijuana and agreed that "cannabis" means "marijuana."

¶ 18     Angelica testified that about 12:15 p.m. on June 17 she was outside her house near the intersection of 98th Street and Avenue J with her two-year-old son Santos who was riding his bicycle in front of the house. Her husband Guadalupe and her son Reynaldo were walking and talking near the intersection. Rubalcava arrived in his vehicle. He parked, exited his vehicle, and engaged in conversation with Guadalupe and Reynaldo. Guadalupe walked across the street while Reynaldo and Rubalcava remained at the corner. Angelica's son Isaiah walked down Avenue J towards Reynaldo and Rubalcava. A white vehicle suddenly pulled up about 20 feet from Angelica. A man with a gun jumped out of the front passenger's seat of the vehicle and began shooting. The driver of the vehicle also began shooting over his window. Angelica could not see the driver's face, but she had a clear view of the full face of the gunman on the passenger's side of the vehicle. The gunman had tattoos on his face including a crown at the left corner of his eye. In court, Angelica identified defendant as that gunman.

¶ 19    Defendant pointed a large black gun towards Reynaldo, Rubalcava, and "it seemed" towards her and Santos. Defendant fired multiple gunshots. Reynaldo and Rubalcava ran. Defendant took a few steps away from his vehicle and continued shooting. Defendant moved closer towards Angelica, Santos, Reynaldo and Rubalcava. Angelica did not see what Isaiah did when the shooting began. When the shooting ended defendant reentered the vehicle and sped away. Angelica grabbed Santos, ran inside her house and called 911. She returned outside and saw Rubalcava collapse in front of her house. Rubalcava said he had been shot and showed her the gunshot wound on the left side of his abdomen. Paramedics and police arrived at the scene and she told them what happened. Defendant and the driver were the only people armed with guns or any type of weapon. In court, Angelica identified photographs that depicted the front of her house, including one that showed Santos' bicycle and the location where she and Santos were at the time of the shooting. About 10 days after the shooting, Angelica viewed a photo array and identified defendant as the shooter who was in the front passenger's seat of the vehicle.

¶ 20    On cross-examination, Angelica denied that she attended school with defendant's mother or aunt, and denied telling Reynaldo that she did so. Defendant attended a children's birthday party at her house once when he was younger, about 15 or 17 years earlier. At that time, Angelica's mother lived next door to defendant's grandparents' home where defendant lived. Defendant's mother was friends with Angelica's sister who invited them to the party. That was the only time Angelica had seen defendant prior to the shooting. When Angelica identified defendant in the photo array as the shooter, she did not know who he was. The police did not tell her his name. On a later date after she had viewed the photo array, Angelica overheard Reynaldo and Isaiah say Sergio Garcia was the shooter. Between June 17 and June 27, Reynaldo did not tell her who he

identified to police as the shooter. Angelica never told police that she had previously met the shooter. At the scene, Angelica described the shooter to police as a dark-skinned man between 20 and 30 years old with a tattoo on his left eye.

¶ 21    On redirect examination, Angelica testified that when defendant was shooting at her and her family, she did not recognize him. She repeated that it had been 15 to 17 years since she had seen him.

¶ 22    Guadalupe testified that about 12:15 p.m. on June 17 he was outside his house about four feet from the intersection of 98th Street and Avenue J talking with his sons Reynaldo and Isaiah. Rubalcava pulled up in his vehicle with his girlfriend, exited his vehicle, and talked with them. Guadalupe told them he was going for a walk and walked past Avenue J heading towards Ewing Avenue. Reynaldo, Isaiah and Rubalcava remained on the corner talking. While he was walking, Guadalupe heard a noise he thought was firecrackers, so he did not turn around. He then heard Angelica and his children screaming and yelling, and he turned around. Guadalupe observed a bald man shooting a gun, aiming at Angelica and Santos. Guadalupe demonstrated that the shooter had both of his arms outstretched and his hands out together. Guadalupe could not see what was in the shooter's hands but heard the gunshots. A second person exited the back of a white vehicle that was stopped in the middle of the intersection and also began shooting. After the shooting started, Guadalupe did not see Reynaldo, Isaiah or Rubalcava. He only saw Angelica and Santos. Guadalupe was about 30 feet away from the shooting and could only see the backs of the shooters. From his vantage point, he could not see them well enough to identify or recognize them. One of the shooters aimed over the white vehicle and the other shooter aimed at Angelica and Santos.

Guadalupe acknowledged that he had a 2008 conviction for possession of cannabis for which he served one year in prison.

¶ 23    On cross-examination, Guadalupe testified that he did not smoke marijuana on the day of the shooting but may have smoked it the previous day. On June 26, Guadalupe spoke with Detective Jason Pullappally but did not tell him that he observed the shooting. He told the detective that he did not see anything.

¶ 24    On redirect examination, Guadalupe testified that he did not tell police about what he heard or observed because he did not want to get involved at that time because of his criminal record. Guadalupe acknowledged that on June 26, he told Pullappally that he was outside when Rubalcava arrived in his vehicle. After a brief conversation, Guadalupe crossed the street to go to the store. Rubalcava continued talking with Reynaldo. Isaiah was also outside. Angelica was outside with Santos, who was riding a bicycle. Guadalupe was halfway down the block when he thought he heard fireworks and did not think much of it. He turned around and realized that the sound was not fireworks and returned to the scene where his family was. He told Pullappally that he did not observe any shooters or vehicles.

¶ 25    Chicago paramedic Lisa Beard testified that she and her partner, Jason Powell, responded to the call to render treatment to Rubalcava. When they arrived, other paramedics were already on the scene treating Rubalcava for two gunshot wounds – one to his left back and one to his left chest. Beard assisted the other paramedics at the scene. Beard and Powell transported Rubalcava to Christ Hospital in an ambulance. While en route, Rubalcava's breathing became more labored and he appeared to be short of breath.

¶ 26    Chicago police sergeant Isaac Lambert testified that about 12:30 p.m. on June 17, he arrived at the scene to investigate the shooting. A police officer gave him defendant's name as the possible identity of one of the shooters. Lambert called Detective Arthur Davis and asked him to generate a photo array including defendant. Reynaldo was transported to the police station to view the photo array. After Reynaldo positively identified defendant, Lambert issued an investigative alert for defendant's arrest.

¶ 27    Chicago police officer Erik Hansen testified that about 7:30 p.m. on June 26, he and his partner, Officer Robert Lobianco, received an investigative alert that was issued for defendant. Lobianco had contact with defendant, and the officers drove to 106th Street to meet with him. Defendant approached their vehicle and turned himself in.

¶ 28    The State presented a stipulation that Chicago police evidence technician Edward McCartan would testify that he processed the crime scene on June 17 and recovered 14 expended cartridge cases and one live round from the intersection of 98th Street and Avenue J. He also recovered a bullet fragment from the dashboard of a vehicle parked on 98th Street. McCartan photographed all of the items prior to their recovery and also photographed the scene.

¶ 29    The State presented a second stipulation that firearms identification expert Kurt Murray would testify that he examined the 14 recovered cartridge cases and found that 13 of them were fired from the same firearm. One of the cartridge cases was not fired from that same firearm.

¶ 30    A third stipulation presented by the State provided that Davis would testify that, based on information he received from another officer, he compiled a photo array that included defendant. Reynaldo viewed the photo array and positively identified defendant as the shooter.

¶ 31 In addition, the State presented a stipulation that Pullappally would testify that on June 27 he interviewed Rubalcava, Angelica and Guadalupe. Pullappally showed photo arrays to Rubalcava and Angelica, and they both identified defendant as the shooter. On June 28, Pullappally interviewed Reynaldo. Pullappally participated in taking handwritten statements from Rubalcava, Angelica, and Reynaldo. The trial court admitted the State's 42 exhibits, most of which were photographs, into evidence.

¶ 32 In a motion for judgment of acquittal, defense counsel argued that there were two shooters and the State failed to prove that defendant was the person who shot Rubalcava and Reynaldo. Counsel further argued that there was no evidence that defendant pointed a gun at Santos or that Santos was near the line of fire, or that defendant pursued Angelica or Isaiah with an intent to kill them. The State responded that Rubalcava, Reynaldo and Angelica all identified defendant as the shooter, and heard and saw him fire multiple gunshots. The State pointed out that all but one of the recovered shell casings came from the same gun. The State noted that while another person fired one shot, Rubalcava and Reynaldo had multiple gunshot injuries. The State argued that the evidence thereby showed that it was defendant who fired multiple times at all of the victims. The trial court denied defendant's motion.

¶ 33 Lorena Ornelas testified that defendant is her fiancé's brother. In June 2014, defendant had been living with her, her boyfriend and children in Whiting, Indiana for six months. On June 17, between 10:30 a.m. and 1:30 p.m., defendant was in their apartment taking care of his two-year-old nephew while Ornelas was getting ready for work. When Ornelas left the apartment at 1:30, defendant was still there. He did not leave the apartment that morning or early afternoon.

¶ 34    Defendant presented a stipulation that Detective Ted Przepiora would testify that on June 28, 2014, Reynaldo gave a statement providing that he had known defendant since he was nine years old. Reynaldo further stated that Angelica and defendant's mother were friends who attended school together. Defendant used to come to their house "all the time" for birthday parties and similar things. Reynaldo's family eventually moved, and he had not seen defendant for about seven years.

¶ 35    The trial court stated that it considered all of the evidence and testimony presented, particularly the eyewitness testimony. The court reviewed the testimony from Rubalcava and Reynaldo in detail. The court noted that Rubalcava testified that he saw two people with guns, however, he persisted that the person who exited the vehicle and shot at him was defendant. The court noted that Reynaldo testified that defendant aimed the gun towards him, he heard about 10 shots, and he did not see anyone else firing a weapon. The court stated that it considered the defense arguments challenging the credibility of the witnesses' identifications of defendant. The court found that based on all of the testimony, the witnesses were not mistaken in their identification. The court found that the witnesses "clearly and credibly" testified as to what they saw, and "made clear, credible identifications" of defendant. Accordingly, the trial court concluded that the State proved defendant guilty beyond a reasonable doubt of all 19 counts.

¶ 36    At the hearing on defendant's motion for a new trial, defense counsel argued that the witnesses' identifications of defendant were not credible. Counsel further argued that there were two shooters and the State failed to prove that it was defendant who fired the shots upon which the charges were based. Counsel also argued that defendant was only seen pursuing Rubalcava, and there was no intent to kill any of the other individuals. Counsel asserted that shooting into a crowd

of people does not show intent to kill, but only supports charges of aggravated battery. The State responded that the witnesses' identifications of defendant were credible. The State relied on its previous argument made during defendant's motion for judgment of acquittal to support its contention that it was defendant who fired the shots upon which the charges were based. The trial court concluded that "there was clear credible evidence identifying Mr. Garcia as the shooter." It further stated that it was "convinced beyond a reasonable doubt that Sergio Garcia was the individual who pulled up in the vehicle, exited, and with a gun shot at a crowd of people very specifically and many times and further chased one among the crowd causing the injuries sustained by each of those testifying." In addition, the court stated:

"With respect to the concern as to whether intent to kill was established, again when a person takes out and aims a firearm at one or more individuals and specifically a crowd and moves further toward that crowd as it disburses and a particular individual within it the intention to kill is shown. The weapon itself is a dangerous one. The firing multiple times at those individuals intent to kill is shown for this Court beyond a reasonable doubt."

Consequently, the trial court denied defendant's motion for a new trial.

¶ 37    During sentencing, on its own motion, the trial court vacated its guilty finding as to count XIV which charged defendant with attempted first degree murder of Reynaldo and causing him permanent disfigurement. The court found that the evidence did not establish beyond a reasonable doubt that Reynaldo sustained permanent disfigurement.

¶ 38    The trial court sentenced defendant on five counts of attempted first degree murder – one count for each of the victims. As to Rubalcava, the court sentenced defendant on count XI to 15 years' imprisonment plus a 25-year sentencing enhancement for personally discharging a firearm

that caused great bodily harm, for an aggregate sentence of 40 years' imprisonment. The court merged counts I, VI, XII, XIII and XV into count XI. As to Reynaldo, the court sentenced defendant on count VII to 15 years' imprisonment plus a 20-year sentencing enhancement for personally discharging a firearm, for an aggregate sentence of 35 years' imprisonment. The court merged counts II and XVI into count VII. As to Santos, the court sentenced defendant on count VIII to 10 years' imprisonment plus the 20-year sentencing enhancement, for an aggregate sentence of 30 years' imprisonment. The court merged counts III and XVII into count VIII. As to Angelica, the court sentenced defendant on count IX to 6 years' imprisonment plus the 20-year sentencing enhancement, for an aggregate sentence of 26 years' imprisonment. The court merged counts IV and XVIII into count IX. And as to Isaiah, the court sentenced defendant on count X to 6 years' imprisonment plus the 20-year sentencing enhancement, for an aggregate sentence of 26 years' imprisonment. The court merged counts V and XIX into count X. The court ordered that all sentences would be served concurrently for a total of 40 years' imprisonment. Defendant did not file a motion to reconsider the sentence.

¶ 39 On appeal, defendant contends that the State failed to prove him guilty beyond a reasonable doubt because it failed to prove that defendant, rather than the other gunman, was personally responsible for firing the gunshots that established the charges of attempted first degree murder. Defendant argues that the evidence did not connect him to any specific shot that was fired where no gun was recovered, and Rubalcava and Reynaldo could not say exactly when they were shot as they both felt burning sensations while running away. He further argues that the evidence did not establish that he had a specific intent to kill Angelica, Santos and Isaiah where there was no testimony that he fired at Isaiah, and Angelica's testimony that "it seemed" that he aimed at her

and Santos was "feeble." In addition, defendant contends that the State cannot argue accountability because it did not raise that theory in the trial court. Alternatively, defendant asserts, in one sentence with no argument, that this court should strike the sentencing enhancements for personally discharging a firearm.

¶ 40    The State responds that the evidence was sufficient to prove defendant guilty beyond a reasonable doubt where three eyewitnesses positively identified defendant as the shooter and testified that he fired his weapon in the direction of all five victims. The State argues that defendant's act of intentionally discharging his weapon several times in the direction of the victims supports the trial court's finding that he attempted to murder each of them. The State further argues that the mere presence of the second shooter does not negate the witnesses' testimony that defendant opened fire towards the group, nor does it create an evidentiary burden that requires forensic proof linking each shot to a specific shooter. The State contends that the trial court's findings were properly based on the evidence and the reasonable inferences drawn therefrom. In addition, the State asserts that defendant's request to strike the sentencing enhancements is forfeited because he did not file a post-sentencing motion or argue plain error, and his claim is without merit where the mandatory enhancements were properly included.

¶ 41    When defendant claims that the evidence is insufficient to sustain his conviction, this court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the offense proved beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48 (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). This standard applies whether the evidence is direct or circumstantial, and does not allow this court to substitute its judgment for that of the fact finder on issues involving witness credibility

and the weight of the evidence. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). Under this standard, all reasonable inferences from the evidence must be allowed in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42.

¶ 42    In a bench trial, the trial court is responsible for determining the credibility of the witnesses, weighing the evidence, resolving conflicts in the evidence, and drawing reasonable inferences from therein. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). In weighing the evidence, the fact finder is not required to disregard the inferences that naturally flow from that evidence, nor must it search for any possible explanation consistent with innocence and raise it to the level of reasonable doubt. *Jackson*, 232 Ill. 2d at 281. We will not reverse a criminal conviction based upon insufficient evidence unless the evidence is so improbable or unsatisfactory that there is reasonable doubt as to defendant's guilt (*People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011)), nor simply because defendant claims that a witness was not credible or that the evidence was contradictory (*Siguenza-Brito*, 235 Ill. 2d at 228).

¶ 43    To prove defendant guilty of the five counts of attempted murder in this case, the State was required to show that, without lawful justification and with an intent to kill, he shot Rubalcava and Reynaldo about the body while armed with a firearm, and shot at Angelica, Santos and Isaiah while armed with a firearm, which constituted a substantial step towards committing first degree murder. 720 ILCS 5/8-4(a), 9-1(a)(1) (West 2014). To trigger the mandatory sentencing enhancements, the State had to prove that during the commission of each offense, defendant personally discharged a firearm, and as to Rubalcava, that doing so proximately caused great bodily harm. 720 ILCS 5/8-4(c)(1)(C), (D) (West 2014).

¶ 44    To sustain a conviction, the State is not required to rule out or disprove all possible factual scenarios. *People v. Newton*, 2018 IL 122958, ¶ 27. This court has previously found that where witness testimony connects a defendant to gunshots, the fact that the defendant was not the only person who fired a gun at the scene does not mean that the evidence was insufficient to prove that the defendant, specifically, fired the gunshots. See *People v. Daniels*, 2016 IL App (4th) 140131, ¶ 98.

¶ 45    Here, viewed in the light most favorable to the State, the record shows that the evidence was sufficient for the trial court to find that defendant was the gunman who fired shots at all five victims. Three eyewitnesses – Rubalcava, Reynaldo and Angelica – all testified that it was defendant who fired multiple gunshots at the five of them as they stood in very close proximity to each other in front of the house. Rubalcava testified that he was standing on the sidewalk with Reynaldo, Isaiah, Angelica and Santos no more than two to three feet away from him. Defendant exited the Impala and pointed a gun at Rubalcava. Rubalcava heard gunshots and saw flashes of fire emitting from the gun in defendant's hand. As Rubalcava ran, he heard more gunshots and observed defendant chasing him and shooting at him. Rubalcava identified defendant in a photo array as the man who shot him.

¶ 46    Similarly, Reynaldo testified that he was standing in front of his house with Rubalcava standing on his right side about an inch away from him, and Isaiah standing on his left side. Reynaldo testified that Angelica was also standing in front of the house and Santos was next to her. Defendant exited the Impala with a gun in his hand and aimed the weapon in Reynaldo's direction. Reynaldo pushed Isaiah to the left. As Reynaldo turned to run he heard gunfire. Reynaldo heard 10 gunshots and sustained three graze wounds. The only person Reynaldo observed firing a

weapon was defendant, who was about 10 feet away from him. Reynaldo identified defendant in the photo array as "[t]he one that was shooting at me." He also identified a photograph of the scene which depicted where he, Isaiah, Rubalcava, Angelica and Santos were standing when defendant began shooting.

¶ 47     In addition, Angelica testified that she was standing outside her house near the intersection with Santos, who was riding his bicycle. Reynaldo and Rubalcava were at the intersection and Isaiah was walking towards them. Defendant jumped out of the front passenger's seat of a white vehicle, pointed a large black gun at Reynaldo, Rubalcava, and "it seemed" her and Santos, and fired multiple gunshots. Angelica observed that defendant took a few steps away from his vehicle, moving closer towards her, Santos, Reynaldo and Rubalcava, and continued shooting at them. Angelica also saw the driver of the vehicle shooting over his window. However, she specifically testified that it was defendant who fired multiple gunshots at her and her family.  The State also presented a stipulation that 13 of the 14 expended cartridge cases recovered from the intersection were fired from the same firearm.

¶ 48     The record shows that the trial court reviewed the eyewitness testimony in detail and specifically noted that Rubalcava and Reynaldo both testified that it was defendant who pointed and fired a gun at them. The court found that the witnesses testified "clearly and credibly" as to their observations, and to their identifications of defendant as the gunman who fired the shots at them. It was the trial court's responsibility to weigh all the evidence and assess the credibility of the witnesses. *Siguenza-Brito*, 235 Ill. 2d at 228. Here, where the witness testimony connected defendant to the multiple gunshots that were fired at them, the fact that the driver of the Impala also fired a gun does not mean that the evidence was insufficient to prove that defendant personally

fired the gunshots that established the charges of attempted first degree murder of the five victims. See *Daniels*, 2016 IL App (4th) 140131, ¶ 98.

¶ 49    Furthermore, defendant's argument that the evidence did not establish that he had a specific intent to kill Angelica, Santos and Isaiah is unpersuasive. Intent to kill is rarely proven through direct evidence because it is a state of mind. *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 52. Consequently, an intent to kill can be established by evidence of the surrounding circumstances including the character of the assault, use of a deadly weapon, and other matters from which such intent can be inferred. *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 39. Defendant's intent to kill can be inferred when it is shown that he willingly and voluntarily committed an act, the natural tendency of which is to destroy another person's life. *Id.* An intent to kill can be proven where the surrounding circumstances show that defendant fired a gun at or towards another person with malice or a total disregard for human life. *Id.* "This court has previously found that '[t]he very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill.' " *Id.* (quoting *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001)). Whether defendant had an intent to kill is a determination for the trier of fact, and on appeal, that finding will not be disturbed unless there is a reasonable doubt as to defendant's guilt. *Id.*

¶ 50    The record here shows that the evidence was sufficient for the trial court to find that defendant had the specific intent to kill all five of the victims. The testimony from Rubalcava, Reynaldo and Angelica established that defendant pointed a gun and fired multiple gunshots in the direction of all five of the victims who were standing in close proximity to each other. That fact alone supports the conclusion that defendant acted with an intent to kill all of the victims.

*Petermon*, 2014 IL App (1st) 113536, ¶ 39. It was within the province of the trial court to determine whether defendant had the requisite intent to kill, and based on the record before us, we find no reason to disturb the court's determination. *Id.*

¶ 51    Alternatively, defendant asserts, in a single sentence, that this court should reduce his sentences by striking the sentencing enhancements for personally discharging a firearm. Defendant has provided no argument in support of this contention, and therefore, this point is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018); *People v. Nere*, 2018 IL 122566, ¶ 25. Accordingly, we give no consideration to this assertion.

¶ 52    For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 53    Affirmed.