2022 IL App (1st) 201209-U

No. 1-20-1209

Order filed December 30, 2022

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 14682 |
| | ) | |
| DORIAN COTLEDGE, | ) | Honorable |
| | ) | Angela M. Petrone, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE C.A. WALKER delivered the judgment of the court.
Justices Oden Johnson and Tailor concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial evidence was sufficient to establish the requisite mental state for defendant's attempted first degree murder conviction where he repeatedly discharged a firearm at the victim, causing multiple injuries. The trial court substantially complied with the required admonishments regarding defendant's right to counsel before permitting him to proceed *pro se*. Defendant's right to a speedy trial was not violated where he occasioned the delay. The trial court properly denied defendant's motion to dismiss the charges where the criminal prosecution against him was not based on a complaint, but rather on an indictment.

¶ 2     Following a bench trial, defendant was found guilty of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2018)), aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2018)), and armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2018)). The trial court merged the attempted first degree murder and aggravated battery with a firearm counts and sentenced defendant to concurrent prison terms of 75 years for attempted first degree murder and 30 years for armed habitual criminal. On appeal, defendant argues, via counsel, that the State failed to prove him guilty beyond a reasonable doubt of attempted first degree murder, as the evidence failed to show he had the specific intent to kill the complainant, Rhythm Bhagat, when he shot him.[1] He also argues the trial court failed to ensure that he knowingly and intelligently waived counsel.

¶ 3     After this case was fully briefed, this court granted defendant leave to file a supplemental *pro se* brief and a briefing schedule was entered. In his supplemental brief, defendant additionally argues that the trial court erred in (1) denying his motion to dismiss based on a violation of his right to a speedy trial; (2) granting the State an extension to the speedy trial term; and (3) failing to dismiss his charges because they were improperly based on a "defective" complaint. We affirm.

¶ 4                                I. Background

¶ 5                             A. Pretrial Proceedings

¶ 6                  1. Pleadings and First Speedy Trial Demands by Counsel

¶ 7     Defendant was arrested on September 20, 2018. A complaint alleging attempted first degree murder was filed against defendant on September 19, 2018. The bottom of each page of the

---

[1] The complaining witness's name is spelled in several different ways throughout the record. We spell his name "Rhythm Bhagat," as it was spelled on the complaint he filed against defendant.

complaint states, "The complainant, being first duly sworn on oath, deposes and says that s/he read the foregoing complaint by him/her sunscribed [*sic*] and that the same is true." This statement was signed and sworn by "Det. P. Torres *** for Rhythm Bhagat" on September 21, 2018. The Cook County Public Defender was appointed to represent defendant and demanded a speedy trial on September 27, 2018.

¶ 8     On October 18, 2018, defendant was charged by indictment, signed by the foreman of the grand jury, with six counts of attempted first degree murder and one count each of aggravated battery with a firearm, armed habitual criminal, aggravated discharge of a firearm, unlawful use of a firearm by a felon (UUWF), and aggravated unlawful use of a weapon, premised on the shooting of Bhagat in Chicago on August 27, 2018. The State proceeded to trial on six counts of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2018)) and single counts of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2018)) and armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2018)). The State nol-prossed the remaining counts.

¶ 9     On October 19, 2018, defendant's counsel filed another demand for a speedy trial. During a court date on October 26, 2018, however, defendant's counsel agreed to a continuance of the case, proposing a subsequent date of November 5, 2018. From November 2018 through April 2019, the State tendered discovery, and the case was continued by agreement of both parties.

¶ 10                    2. Defendant's *Pro Se* Pretrial Motions

¶ 11    On April 11, 2019, defendant filed a *pro se* "motion to waive counsel and represent himself." On April 29, 2019, defendant confirmed with the trial court that he wished to proceed *pro se*. The court inquired into defendant's educational background. Defendant informed the court he received paralegal training but did not go to law school or graduate college. The court began

admonishing defendant about proceeding *pro se* but continued the matter to confirm defendant's sentencing range, because the court did not "want to give [defendant] the wrong admonishments."

¶ 12 On May 30, 2019, the court addressed defendant while the State and defense counsel were present and began its admonishments again. Defendant confirmed that he still wanted to proceed *pro se*. The court then admonished defendant that he was charged with a "variety of offenses" committed toward Bhagat on August 27, 2018, and listed the counts. The court read out loud the three attempted first degree murder charges that it characterized as carrying the greatest penalties, which included sentencing enhancements for personally discharging a firearm causing permanent disfigurement, permanent disability, and great bodily harm. It admonished defendant that, if the State proved any of the three attempted first degree murder charges, "the lowest sentence is 31 years and the maximum is life," which included the enhancements. Defendant confirmed that he understood he was facing a sentencing range of 31 years to natural life and that, if he received a term less than natural life, "say *** a sentence of 75 years," he would still serve 3 years of parole and face a possible fine of up to $25,000. The trial court further admonished defendant that he had a right to counsel and, if indigent, he would be appointed counsel. Defendant stated he understood.

¶ 13 Additionally, defendant confirmed he understood that presenting a defense requires "adherence to various technical rules" governing trial conduct, and the prosecution will be represented by an experienced attorney. Defendant also confirmed he understood that he would be held to the same rules as an experienced attorney, and the court could not step in to help him or give him "any special consideration." He confirmed he understood that if the court accepted his decision to represent himself, he could not change his mind during trial. The court informed defendant it would give him a week to "seriously think about" proceeding *pro se* because, if

convicted, he could spend "the rest of [his] life in prison." The trial court further stated that "[i]t's a very serious matter and a very important decision" and the court did not want defendant to "take it lightly."

¶ 14　On June 6, 2019, one week later, defendant confirmed with the court he still wanted to represent himself. The court granted defendant's request to proceed *pro se*.

¶ 15　Throughout the remainder of 2019, defendant filed numerous *pro se* motions to, *inter alia*, substitute the judge, suppress evidence, dismiss his charges, and reconsider court rulings.[2]

¶ 16　Among these motions, on August 21, 2019, defendant filed a motion to dismiss his charges, which he filed again on November 7, 2019. He alleged his indictment was improperly based on a complaint, which he claimed was the original charging instrument, and the complaint was defective because it was signed by Detective Peter Torres and not the complainant, Bhagat.

¶ 17　On December 16, 2019, defendant filed a *pro se* "demand for speedy trial," stating he "demands a speedy trial, and demands the time starts today." The court informed defendant his demand would not start running until his pending motions were resolved, and it would rule on the motions on the next court date. On December 18, 2019, the court confirmed with defendant which motions were still pending and continued the case by agreement.

¶ 18　On December 20, 2019, the court ruled on the "last of" defendant's motions. Among the multiple motions the court addressed, it denied defendant's motion to dismiss his charges based on a defective complaint. The court found that "[t]he proper process for charging the defendant was followed" and there was no legal authority supporting defendant's claim that the detective's signature invalidated his complaint and required dismissal of the underlying charges. The court

---

[2] Defendant had also filed *pro se* motions while still represented by counsel.

explained that a judge found probable cause to detain defendant and the complaint was properly "super[s]eded" by a timely indictment following grand jury proceedings. Having ruled on defendant's outstanding motions, the court referenced defendant's prior written demand for a speedy trial and set a jury trial for February 10, 2020.

¶ 19                3. The State's Motion for Extension of Speedy Trial Term

¶ 20    On January 30, 2020, the State filed a motion for a 60-day extension of the speedy trial term pursuant to the Speedy Trial Act (725 ILCS 5/103-5 (West 2018)). The State explained that, during the pendency of the case, Bhagat moved back to India, making communication more difficult. The State spoke with Bhagat, who on January 25 agreed to travel from India to testify, but he required a "Visa or other Department of Homeland Security [(DHS)] permission" to enter the United States. On January 28, 2020, the State began assisting Bhagat in applying for entry into the United States, but it could not estimate the time frame for the DHS's review and processing of Bhagat's visa application. The State asserted that defendant could not claim prejudice from an extension, and, rather than asserting his right to a speedy trial earlier, defendant "chose to file and argue" about 10 motions from June through December 2019.

¶ 21    The same day, January 30, 2020, defendant filed a *pro se* "motion to discharge" based on a "statutory violation of speedy trial rights." He claimed the court "acknowledged" his oral demand for a speedy trial on October 19, 2018, and that he had made a written demand for a speedy trial on December 16, 2019. Defendant asserted the "speedy trial clock never stop[ped] running" from September 20, 2018, the date of his arrest. He also claimed that he had not "occasion[ed]" any delay in the proceedings from September 20, 2018. The parties agreed to continue the matter to February 10, 2020.

¶ 22    On February 10, 2020, defendant filed a written *pro se* "objection" to the State's motion for an extension of the speedy trial term. He asserted that he had a right to pursue his defense and the State delayed tendering discovery. He argued his *pro se* motions were not time consuming or complex, and the State was "shifting its responsibility of bring[ing] the defendant to trial within the 120-day rule." The court continued the matter to the next day.

¶ 23    On February 11, 2020, the trial court entered an order granting the State's request to extend the speedy trial term by 60 days. The court found that the State had exercised due diligence in contacting Bhagat, and the State's request was statutorily permissible and reasonable, as the length of time for the witness to navigate the visa immigration system was undetermined. The court rejected defendant's claim that he first orally demanded trial on September 20, 2018, finding the claim was invalid because the decision to demand trial rested with defendant's then-appointed counsel, not defendant. The court found defendant's *pro se* demand for a speedy trial was entered on December 20, 2019.

¶ 24    On February 27, 2020, defendant filed a *pro se* motion to reconsider the extension of the speedy trial term, which the court denied. The court continued the case to March 10, 2020, over defendant's objection.

¶ 25    On March 10, 2020, defendant filed a *pro se* "continual objection to this court['s] grant of the State['s] motion for extension of speedy trial term/and denial of his motion to discharge based on statutory speedy trial right." The court also denied this request.

¶ 26                              B. Trial Proceedings

¶ 27    Defendant's bench trial began on March 16, 2020.

¶ 28    Bhagat testified that, in 2018, he came to the United States on a student visa. In August 2018, he worked as a cashier at a local market and defendant worked as a security guard at the same market. Bhagat and defendant became friends through work.

¶ 29    On August 27, 2018, defendant, who by that time had been fired from the market, called Bhagat, who was at home, and asked for money. Bhagat said he did not have the money. Bhagat had previously loaned money to defendant six or seven times, and defendant was always late in paying him back. Defendant offered Bhagat a "gun or something like that." Bhagat responded, "no," but agreed to lend defendant $300 because he had known defendant for eight or nine months and defendant was "in trouble." Bhagat told defendant to come to his house for the money. When defendant arrived in his vehicle, Bhagat ran out in the street. Defendant asked him to enter the vehicle and said they would come back in 10 or 15 minutes. Bhagat entered the vehicle's front passenger seat.

¶ 30    Defendant drove Bhagat into an alley, stopped the vehicle, exited, and told Bhagat to exit. Bhagat complied. Defendant then walked around the rear of the vehicle to the passenger's side with a firearm in his hand. Bhagat asked defendant, "[W]hat you doing, Bro?" Defendant then shot Bhagat. Defendant continued shooting as Bhagat ran to a busy street.

¶ 31    Bhagat sat down and called 911. He felt "weak" and was bleeding "a lot." Paramedics arrived and transported him to a hospital. A bullet had passed through his right arm and broke his bone, leaving a bullet wound on the inside of the arm near the elbow and another on the outside of the arm near the wrist. Another bullet had grazed his right chest "ribs area." Bhagat received surgery to fix his broken arm, and they "patch[ed] up" the graze wound on his chest. On September 6, 2018, Bhagat went to a police station and identified defendant as the shooter from a photo array.

¶ 32    The State published surveillance video footage from the Hamline Elementary School in that alleyway. Bhagat confirmed that the video depicted the events in the alley on August 27, 2018, in which defendant shot him. He described the video as it was played, stating it showed him and defendant outside the vehicle.

¶ 33    We have viewed the video footage, which is included in the record on appeal. The video has no audio. In the video, we see a vehicle stop in an alley, with the driver's side facing toward the school and its camera. Defendant exits the driver's side of the vehicle and leans back inside through the open driver's side door. Bhagat exits soon afterwards from the passenger's side. They both walk to the rear of the vehicle from their respective sides. Bhagat reaches the rear passenger side of the vehicle and stops, facing defendant's direction. From the rear driver's side of the vehicle, defendant is seen with his left hand raised pointing an object at Bhagat. Bhagat flinches backwards. Bhagat moves a short distance toward the passenger's side door. Defendant walks around the rear of the vehicle to the rear passenger side of the vehicle. Defendant points the object at Bhagat. Bhagat raises his arms to just above waist height. Bhagat flinches backwards again, doubles over, turns around, and runs. Defendant points the object in Bhagat's direction and runs the length of the passenger side of the vehicle after Bhagat. Defendant reaches the front of his vehicle, walks around the front of it toward the driver's side, enters his vehicle, and drives in the same direction that Bhagat ran.

¶ 34    Bhagat testified that, at the time of the incident, he did not have a knife or firearm, and he had never held a firearm. In court, he rolled up his sleeve and showed the scarring on his right arm from the shooting. Bhagat still had difficulty lifting weight with his right hand, which was his dominant hand. Bhagat left the United States because of this incident.

¶ 35     On cross-examination, Bhagat explained his reference of defendant being "in trouble" as defendant being in debt "because people always used to come in the store asking [defendant] for money." Bhagat had previously shown defendant a picture of himself while he was in New York with a "pellet gun," but he denied it was a "real gun." Bhagat denied approaching defendant to buy a weapon. On the date of the incident, defendant called him first.

¶ 36     Chicago police evidence technician Stephen Balcerzak testified that on August 27, 2018, he processed the scene of the alley near Hamline Elementary School. Balcerzak photographed the scene and recovered surveillance footage from nearby surveillance cameras and other items of evidence. The State entered the photographs into evidence. Balcerzak testified that the photographs depicted, all with the same caliber, (1) a fired bullet, labeled marker number one; (2) two live, unfired bullets, labeled marker numbers two and three respectively; and (3) three expended "shell" casings, labeled marker numbers four, five, and six respectively.

¶ 37     This court has reviewed the photographs, which are included in the record on appeal. We observe two photographs show that marker number two is located on the side of the alley closest to the school, marker number six is located farther up the same side of the alley, marker numbers four and five are close to a dumpster on the opposite side of the alley, and marker number three is located in the middle of the alley. Other photographs show marker number one located in another section of the alley next to a blue garbage bin.

¶ 38     Chicago police detective Torres testified that, on the day of the shooting, he went to the scene and observed the ballistic evidence, which was all 380-caliber. At about 9 p.m., he interviewed Bhagat in the emergency room while Detectives Alex Kim and Edward Villalobos

were present. Bhagat named defendant as the shooter and gave Torres defendant's phone number. Defendant was arrested on September 20, 2018.

¶ 39    Dr. Jennifer Cone, a trauma surgeon who treated Bhagat in the emergency room, testified that Bhagat had sustained a graze gunshot wound to his right chest, one gunshot wound to his right anterior forearm, another gunshot wound to his right posterior forearm, and a broken right forearm.

¶ 40    On cross-examination, Dr. Cone testified that a single bullet could have caused both of Bhagat's arm wounds, but "we usually don't comment on if a wound is sustained by two separate bullets or whether it's a through and through wound."

¶ 41    The State entered into evidence certified copies of defendant's prior convictions for UUWF in case number "92 CR 2324501" and attempted first degree murder, aggravated battery, and armed violence in case number "92 CR 2324601."

¶ 42    Defendant testified on his own behalf in narrative form. Defendant was employed by a security company and worked at the market from early 2017 until the time of the incident. Bhagat started working at the market around September 2017. Defendant and Bhagat became "good friends." Defendant started borrowing money from Bhagat to help treat his girlfriend's cervical cancer.

¶ 43    Defendant testified that Bhagat had "a lot of problems" at work, drank a lot, and tried to make friends with the wrong crowd. On one occasion, Bhagat showed defendant pictures of himself in New York depicting "how he had weapons, and he was affiliated with the Latin Kings." Defendant grew tired of "dealing with" Bhagat's "problems," transferred himself out of the market, and, as sergeant of the security company, sent other officers to work at the market with Bhagat. Defendant kept in contact with Bhagat because he knew he could lean on him for "a loan or

something." One day, Bhagat asked defendant if defendant could help him buy a firearm. Defendant said he "might be able to help" because he had a friend who sold firearms, but that friend was not selling the type of firearm Bhagat wanted.

¶ 44    On August 27, Bhagat called defendant and stated, "[H]ey, man, listen do you got something for me?" Defendant answered, "[Y]eah, I'll come get you." He picked Bhagat up in his vehicle, showed Bhagat a weapon, and said his friend wanted $1000 for it. Bhagat wanted to test the weapon and stated, "[L]et's take a ride." They parked in an alley. Defendant removed the weapon from the glove compartment and showed it to Bhagat, who said, "[C]ome on let's get out [of] the car, let me see how it works." They exited the vehicle and defendant walked around the back of the vehicle. Bhagat stated, "[N]o, man, no, I got to get something that is different." Defendant said, "[W]ell, man this is what she got right now, you [are] gonna take it or leave it." Bhagat responded, "[L]et me see how it works."

¶ 45    Bhagat suddenly pulled out a knife. Defendant said, "[M]an, what is wrong *** with you," and, "[H]ey, man, you got to get off of me." Bhagat "tried to come at" defendant with the knife. Defendant fired his weapon, and Bhagat ran. Defendant entered his vehicle and drove away.

¶ 46    On cross-examination, defendant testified that he was trying to sell a 25-caliber firearm, and not a 380-caliber one. He admitted he possessed a firearm even though he was aware that a felon cannot possess a weapon in Illinois. He could not sell the firearm at Bhagat's house because it was on a busy street, and there was no place nearby to test the firearm. Bhagat chose the elementary school alley because it was the first alley they saw. Defendant testified that he only shot at Bhagat once out of self-defense. He denied firing the weapon again or chasing after Bhagat. Defendant could have called the police to say Bhagat "attacked" him but did not tell the police

about the incident until his arrest on September 20, 2018. He confirmed that he denied the incident to police at first but later admitted to it.

¶ 47    The trial court found the State proved all counts of attempted first degree murder but, citing the one-act, one-crime doctrine, found defendant guilty of one count each of attempted first degree murder, aggravated battery with a firearm, and armed habitual criminal. The court found that Bhagat testified credibly and his version of events, of an unprovoked attack by defendant, was corroborated by his bullet wounds and the video and photographic evidence.

¶ 48    The court found defendant's version of events not credible and contradicted by the video, physical evidence, medical testimony, and Bhagat's testimony. The trial court noted that a knife was neither seen in the video evidence nor recovered from the scene. Further, the gunshot wounds to Bhagat's right chest and forearm showed Bhagat's arm was held in a "defensive posture" to "deflect the impact or flow of the bullet to the right chest." The court found that defendant's intent to kill was established by defendant's continuous firing at Bhagat as Bhagat ran, even after Bhagat was shot. The court concluded that defendant personally discharged a firearm, which was a "substantial step towards the commission of the offense of first degree murder," and there was an "unequivocal expression of intent to kill."

¶ 49                      C. Post-Trial Motion and Sentencing

¶ 50    On October 6, 2020, defendant filed a *pro se* motion for new trial alleging, *inter alia*, that the trial court erred in denying his various *pro se* pretrial motions, including his motions regarding a defective complaint and speedy trial violation. He also argued the court erred in "denying" his

self-defense theory, not "considering" his necessity theory, and denying his "oral motion for appointment of counsel."[3]

¶ 51    At a hearing on defendant's motion for new trial, he argued, in relevant part, that the trial court "offered [him] counsel *** way before trial," and defendant "took it the next day," but the court "turned around and *** denied it." Defendant stated he did not understand the trial court's decision because the court "was the one that offered counsel to [him]." When he filed a motion to substitute judge due to judicial bias, the judge talked to him about proceeding *pro se* for 20 minutes instead of discussing the motion. Defendant stated, "I thought I had a constitutional right to be pro se" and "didn't know that I was offending anybody because I became pro se."

¶ 52    The State responded that defendant was appointed a public defender but decided to proceed *pro se* and spent over one year filing *pro se* motions.

¶ 53    The trial court denied defendant's motion for new trial. The court recalled the case's procedural history and that it had admonished defendant about proceeding *pro se* and "vehemently cautioned [defendant] against that." The court stated that it had encouraged defendant to watch the video evidence before he decided, but defendant "insisted" on proceeding *pro se*. The court told defendant, it "did not deny you counsel. You had counsel. *** And you insisted you wanted to go *pro se* and you were admonished multiple times."

¶ 54    At sentencing, the trial court merged the aggravated battery with a firearm count into the armed habitual criminal count. It sentenced defendant to concurrent prison terms of 75 years for

---

[3] The record does not reflect that defendant filed a "motion for appointment of counsel" after the trial court granted his motion to proceed *pro se*. However, the record does reflect that, prior to trial, defendant moved to suppress "all pre-trial evidence used to establish probable cause," alleging he was denied the right to counsel at the preliminary hearing prior to his indictment.

attempted first degree murder, and 30 years for armed habitual criminal. The court believed that, based on defendant's prior record of violence, including another attempted first degree murder conviction, it would not be unreasonable to sentence him to natural life, but balanced the mitigating evidence against "the egregious acts committed against a particularly innocent person who but[ ] for having the grace to put his arm up and block the wound [would] have gotten a gunshot wound right to his heart and who the defendant continued to fire at as he ran away." The court also stated that, if it had found Bhagat suffered "severe bodily injury," defendant's sentences would be consecutive, but it was "making a distinction between severe bodily injury and great bodily harm."

¶ 55                                      II. Analysis

¶ 56                          A. Sufficiency of the Evidence

¶ 57     On appeal, defendant argues the State failed to prove him guilty beyond a reasonable doubt of attempted first degree murder, as the evidence failed to establish that he had the specific intent to kill Bhagat. Defendant asserts there was no evidence that he pursued Bhagat, he made no statements evincing his intent to kill, and he did not take the opportunity to kill Bhagat when he had the chance.

¶ 58     "The due process clause of the fourteenth amendment to the United States Constitution requires that a person may not be convicted in state court 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). When reviewing the sufficiency of the evidence at trial, our inquiry is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found

- 15 -

the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Cooper*, 194 Ill. 2d 419, 430-31 (2000) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 59 It is well-established that it is the role of the trier of fact "to determine the credibility of witnesses, to weigh their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence." *People v. Williams*, 193 Ill. 2d 306, 338 (2000). The trier of fact need not "disregard inferences which flow normally from the evidence before it," or "search out all possible explanations consistent with innocence, and raise those explanations to a level of reasonable doubt." *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60. We will not reverse a conviction unless the evidence is "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt" (*People v. Bradford*, 2016 IL 118674, ¶ 12).

¶ 60 Here, the State had to prove that defendant attempted the offense of first degree murder of Bhagat. To support a conviction for attempted first degree murder, the State must establish beyond a reasonable doubt that a defendant (1) performed an act constituting a "substantial step" toward the commission of murder, and (2) possessed the criminal intent to kill the victim. See 720 ILCS 5/8-4(a) (West 2018); *People v. Teague*, 2013 IL App (1st) 110349, ¶ 22. A person who kills an individual without legal justification commits first degree murder if, in performing the acts that cause the death, "he or she intends to kill or do great bodily harm to that individual or another or knows that such acts will cause death to that individual or another." 720 ILCS 5/9-1(a)(1) (West 2018).

¶ 61 On appeal, defendant does not dispute that the State proved he fired a weapon at Bhagat causing his injuries or disproved his self-defense theory at trial. He only argues the State failed to prove he had the specific intent to kill Bhagat.

¶ 62     "Proof of a specific intent to kill is an indispensable element of attempt first degree murder." *People v. Hill*, 276 Ill. App. 3d 683, 687 (1995). Because intent is a state of mind, it is rarely shown with direct evidence. *People v. Reynolds*, 2021 IL App (1st) 181227, ¶ 34. Intent may be inferred from the character of the defendant's conduct, and the circumstances surrounding the commission of the offense, including "the character of the assault, the use of a deadly weapon, and the nature and extent of the victim's injuries." *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 59. This court has found that "[t]he very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill." (Internal quotation marks omitted.) *People v. Vega*, 2018 IL App (1st) 160619, ¶ 41. "The trier of fact determines the existence of the requisite intent and reviewing courts will not disturb that finding unless it clearly appears there is reasonable doubt." *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 52.

¶ 63     Here, viewing the evidence in the light most favorable to the State, we find the evidence sufficient to prove defendant had the intent to kill Bhagat. At trial, Bhagat testified that defendant drove him to an alley where they both exited the vehicle. Defendant walked around the rear of the vehicle while holding a firearm and shot Bhagat. Defendant continued shooting at Bhagat as Bhagat ran away. Bhagat suffered multiple wounds from being shot, including a graze wound to his right chest, and two gunshot wounds and a broken bone in his right forearm. Bhagat had scarring and lasting effects from his injuries. Bhagat's testimony detailing the circumstances of the shooting in the alley while he was unarmed, which the trial court found credible, was alone sufficient to establish that defendant intended to kill him. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) ("[T]he testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant."); *Vega*, 2018 IL App (1st) 160619, ¶ 42

(the evidence was sufficient to show the defendant had intent to kill the victims where he pointed a firearm at them, shot one victim in the hand and abdomen, and shot the other victim as he attempted to crawl away).

¶ 64    Further, the State presented physical evidence that corroborated Bhagat's account and contradicted defendant's account. First, the video evidence corroborated Bhagat's account that defendant shot at him multiple times and from a close distance. See *People v. Pearson*, 2018 IL App (1st) 142819, ¶ 34 (the evidence established the defendant's intent to kill the victim, where the testimony and surveillance footage all showed that the defendant pointed a firearm at the victim and fired at the victim from 1 to 1½ feet away, striking the victim in the chest). It was the role of the trial court, as finder of fact, to resolve any conflicts in evidence, and here, the court concluded that the video evidence supported the State's case and contradicted defendant's theory of self-defense. *Williams*, 193 Ill. 2d at 338. Our review of the video footage does not show otherwise. We will not retry a defendant when reviewing a challenge to the sufficiency of the evidence. *People v. Nere*, 2018 IL 122566, ¶ 69.

¶ 65    Second, photographs showed ballistic evidence, including one fired bullet and three expended shell casings, scattered at different places in the alley. This evidence closely aligned with Bhagat's account that defendant continued shooting at him as defendant pursued him around the vehicle. Given the physical evidence documenting defendant's pursuit of Bhagat and continuous firing at him from a close range, which corroborated Bhagat's version of events, we do not find that the evidence of defendant's intent to kill was "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Bradford*, 2016 IL 118674, ¶ 12.

¶ 66    Nevertheless, defendant asserts the evidence did not establish that he had the specific intent to kill because he made no statements "evincing his intent." However, the specific intent to kill is a state of mind and therefore rarely proven with direct evidence. *Reynolds*, 2021 IL App (1st) 181227, ¶ 34. As we have found, the character of the shooting, defendant's use of the firearm, and the nature of and extent of Bhagat's injuries supported an inference beyond a reasonable doubt that defendant intended to kill Bhagat. *Carlisle*, 2015 IL App (1st) 131144, ¶ 59.

¶ 67    Defendant also argues that the evidence failed to establish his intent to kill because he had the opportunity to kill Bhagat much sooner. Specifically, he claims defendant could have used his firearm "right away," but rather drove Bhagat "around town" and had Bhagat exit the vehicle before shooting at him, giving Bhagat the opportunity to leave. Defendant also argues he could have easily caught up with Bhagat and killed him but instead returned to his vehicle. Regardless of whether defendant could have attempted to kill Bhagat sooner or chased him further down the alley to shoot him again, a rational trier of fact could have found defendant intended to kill Bhagat when he shot at him multiple times, including face-to-face from a few feet away, engaging in conduct that had a "natural tendency *** to destroy another's life." (Internal quotation marks omitted.) *Pearson*, 2018 IL App (1st) 142819, ¶¶ 35-38 (rejecting the defendant's argument that the evidence did not establish the specific intent to kill "because he could have killed [the victim] if he had so desired). Under the circumstances surrounding the shooting, we find the State met its burden of demonstrating that defendant acted with the intent to kill Bhagat. See *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 39 ("[T]he very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill." (Internal quotation marks

omitted.)). Accordingly, we find the trial evidence was sufficient to prove defendant guilty beyond a reasonable doubt of attempted first degree murder.

¶ 68                                    B. Waiver of Counsel

¶ 69    Defendant next argues that the trial court failed to ensure his waiver of his right to counsel was knowingly and intelligently made. Specifically, defendant claims the trial court failed to admonish him pursuant to Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) that his sentences on the two lesser charges of aggravated battery with a firearm and armed habitual criminal could be imposed consecutively, resulting in a lengthy prison term even if he was acquitted of attempted first degree murder with a firearm.

¶ 70    Defendant acknowledges this issue was not preserved for appeal, as he neither objected at trial nor raised the issue in a written posttrial motion. *People v. Herndon*, 2015 IL 123375, ¶¶ 23-24 (challenge to Rule 401(a) admonishments is forfeited where the defendant fails to object to the error at trial and does not raise the issue in a written posttrial motion). He requests review under the plain-error doctrine.

¶ 71    Under the plain-error doctrine, a reviewing court may consider forfeited errors under two alternative prongs: (1) "when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "when a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Moon*, 2022 IL 125959, ¶ 20.

¶ 72    Defendant raises second prong plain error. However, to prevail under either prong, he bears the burden of proving actual error. *People v. Mudd*, 2022 IL 126830, ¶ 22. Without an error, there can be no plain error. *People v. Hood*, 2016 IL 118581, ¶ 18. Thus, the first step in a plain error analysis is to determine if a clear or obvious error occurred. *People v. Reese*, 2017 IL 120011, ¶ 60. We find no error here.

¶ 73    The United States Constitution guarantees the right to the assistance of counsel in a criminal proceeding. *People v. Haynes*, 174 Ill. 2d 204, 235 (1996). A defendant may waive this right and choose to proceed *pro se*. *People v. Perkins*, 2018 IL App (1st) 133981, ¶ 41. Under Rule 401(a), the trial court shall not permit a defendant to waive counsel without first "addressing the defendant personally in open court, informing him of and determining that" he understands the following:

> "(1) the nature of the charge;

> (2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and

> (3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court." Ill. S. Ct. R. 401(a) (eff. July 1, 1984).

¶ 74    Without proper admonishments, there can be no effective waiver of counsel. *People v. Langley*, 226 Ill. App. 3d 742, 749 (1992). While compliance with Rule 401(a) is required for an effective waiver of counsel, "[s]trict technical compliance" is not always required. (Internal quotations marks omitted.) *People v. Wright*, 2017 IL 119561, ¶ 41. "Rather, substantial compliance will be sufficient to effectuate a valid waiver if the record indicates that the waiver

was made knowingly and voluntarily, and the admonishment the defendant received did not prejudice his rights." *Haynes*, 174 Ill. 2d at 236. "The requirement of knowing and intelligent choice calls for nothing less than a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *People v. Kidd*, 178 Ill. 2d 92, 104-05 (1997).

¶ 75 Substantial compliance with Rule 401(a) occurs where any failure to fully provide admonishments does not prejudice defendant because either "(1) the absence of a detail from the admonishments did not impede defendant from giving a knowing and intelligent waiver; or (2) defendant possessed a degree of knowledge or sophistication that excused the lack of admonition." *People v. Khan*, 2021 IL App (1st) 190051, ¶ 55. Whether the trial court's admonishments substantially complied with Rule 401(a) depends on the particular facts of the case. *Wright*, 2017 IL 119561, ¶ 54. "The legal issue of whether the trial court substantially complied with Rule 401(a) is reviewed *de novo*, while the ultimate question of whether the defendant's waiver of counsel was knowing, and voluntary is reviewed for an abuse of discretion." *Khan*, 2021 IL App (1st) 190051, ¶ 46.

¶ 76 Defendant does not dispute that the trial court properly admonished him under subsections (a)(1) and (a)(3) of Rule 401. Rather, he contends the court did not properly admonish him as required by subsection (a)(2). He contends the trial court should have admonished him that he would have been subject to mandatory consecutive sentences with "an equally extreme period of incarceration" on the aggravated battery with a firearm and armed habitual criminal charges had the court found that he inflicted "severe bodily injury."[4] See 730 ILCS 5/5-8-4(d)(1) (West 2018)

---

[4] Defendant contends he was subject to up to 120 years in prison if convicted on the aggravated battery with a firearm and armed habitual criminal charges.

(mandatory consecutive sentences upon finding that the defendant committed a Class X or Class 1 felony and inflicted "severe bodily injury"). We find no error in the court's admonishments.

¶ 77 The trial court admonished defendant as to his charges as follows: it informed him that his attempted first degree murder charge carried the greatest penalty, advised defendant regarding the three most serious attempted first degree murder counts and read them out loud, and admonished defendant he could receive a sentence from 31 years to natural life for attempted first degree murder with sentence enhancements. Defendant confirmed he understood. The trial court then admonished defendant he had a right to counsel, and, if he was indigent, he had a right to have counsel appointed to him. Defendant confirmed he understood. Defendant acknowledges he was properly informed of the maximum sentence of his most severe charge, *i.e.*, a term of natural life in prison on the attempted first degree murder charge.

¶ 78 The court's admonishments regarding the sentencing range for attempted first degree murder, the offense that carried the most serious possible sentence of natural life in prison, substantially complied with Rule 401(a)(2). See *Haynes*, 174 Ill. 2d at 243 (trial court substantially complied with Rule 401(a) by admonishing the defendant of the sentencing range for "the most serious charge against him, first degree murder," as the importance of the defendant having knowledge of the sentencing range for burglary "pale[d] in comparison" (internal quotation marks omitted)).

¶ 79 As defendant points out, the failure to admonish a defendant about the potential for consecutive sentences can be "a failure to explicitly inform him of the true maximum penalty he faced." *People v. Bahrs*, 2013 IL App (4th) 110903, ¶ 14. Here, however, the court admonished defendant regarding the maximum penalty he faced, natural life in prison on the attempted first

degree murder charge. See *People v. Risper*, 2020 IL App (1st) 160707, ¶ 50 (noting this court has previously concluded that, with Illinois no longer imposing the death penalty, a natural life sentence without the possibility of parole is the most severe sentence allowed in Illinois). Therefore, the court was not required to admonish him as to all possible sentences he could have received on lesser charges to substantially comply with Rule 401(a)(2). See *People v. Stewart*, 101 Ill. 2d 470, 487-88 (1984) (the trial court substantially complied with Rule 401(a) by admonishing the defendant that he might receive a death sentence, and the court was not required to "ceremoniously inform the defendant of all the lesser sentences which could possibly be imposed"); *People v. Pike*, 2016 IL App (1st) 122626, ¶ 125.

¶ 80     Even if the trial court failed to substantially comply with Rule 401(a), defendant suffered no prejudice from the failure to advise him he could be subject to consecutive enhanced sentences on the two less serious offenses. Further, the defendant was not prejudiced because he did not receive a consecutive sentence. Our supreme court's decision in *Wright*, 2017 IL 119561, controls. In *Wright*, the trial court properly admonished the defendant in all respects but one, namely, the court informed the defendant that his maximum possible sentence was 60 years, when it was actually 75 years. *Id.* ¶ 52. The court found the defendant was not prejudiced by the understated maximum sentence because he ultimately received a 50-year sentence, which was below the understated maximum conveyed in the admonishments. *Id.* ¶ 56. Here, even if the court did somehow understate the maximum sentence by informing defendant he faced natural life in prison, he only received a total of 75 years in prison and thus, under *Wright* was not prejudiced by the imperfect admonishment.

¶ 81 Further, defendant confirmed his wish to proceed *pro se* in court on multiple court dates, and he was adamant about representing himself even after being admonished that he could receive a natural life prison sentence. With the knowledge that he faced a natural life prison term, defendant still chose to waive counsel. We find defendant knowingly and intelligently waived his right to counsel and his decision to represent himself must be honored. *Haynes*, 174 Ill. 2d at 241; see *Khan*, 2021 IL App (1st) 190051, ¶ 55 (trial court substantially complied where "the absence of a detail from the admonishments did not impede defendant from giving a knowing and intelligent waiver"). Because the trial court committed no error in giving Rule 401(a)(2) admonishments, plain-error review is unnecessary.

¶ 82                    C. Defendant's *Pro Se* Supplemental Appellate Brief

¶ 83                              1. Right to Speedy Trial

¶ 84 In his *pro se* supplemental brief, defendant next argues that the trial court erred in (1) denying his motion to dismiss his case based on a statutory violation of his speedy trial right, and (2) granting the State's motion to extend the speedy trial term by 60 days.

¶ 85 Under section 103-5(a) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/103-5(a) (West 2018)), every person in custody in Illinois shall be tried within 120 days from the date he or she was taken into custody "unless delay is occasioned by the defendant." "Delay shall be considered to be agreed to by the defendant unless he or she objects to the delay by making a written demand for trial or an oral demand for trial on the record." *Id.* "When the parties agree, on the record, to a continuance, the delay is attributable to the defendant." *People v. Littleton*, 2014 IL App (1st) 121950, ¶ 77.

¶ 86    In determining whether a defendant has been denied his right to a speedy trial, we must examine the record in its totality and consider four factors: "the length of the delay; the reasons for the delay; the prejudice, if any, to the defendant; and defendant's assertion of his right." *People v. Crane*, 195 Ill. 2d 42, 48 (2001). The trial court's determination of who is responsible for the delay of trial is entitled to deference and will be sustained absent an abuse of discretion. *People v. Kliner*, 185 Ill. 2d 81, 115 (1998).

¶ 87    We find defendant was not denied his right to a speedy trial, and the trial court properly concluded that defendant was responsible for delaying his trial. Defendant was arrested on September 20, 2018, and so the 120-day speedy trial period began to run on that date. See 725 ILCS 5/103-5(a) (West 2018) (the 120-day term begins when the defendant is taken into custody). Defense counsel filed a demand for speedy trial on September 27, 2018, but then agreed to continue the case on October 26, 2018, and on subsequent court dates through April 29, 2019. Therefore, any delay of defendant's trial from October 26, 2018, to April 29, 2019, was attributable to defendant, as the parties agreed to continue the case throughout these months. *Littleton*, 2014 IL App (1st) 121950, ¶ 77 (delay is occasioned by the defendant where the parties agree to a continuance).

¶ 88    Defendant moved to proceed *pro se* on April 29, 2019, and the parties agreed to continue his motion. On June 6, 2019, defendant's request to represent himself was granted. This period of agreed continuance is also construed against defendant (*Littleton*, 2014 IL App (1st) 121950, ¶ 77), as he did not object to any continuance by moving either orally on the record or in writing to demand trial as necessary but rather took an active role in continuing his case for months (725 ILCS 5/103-5(a) (West 2018)) ("Delay shall be considered to be agreed to by the defendant unless

he or she objects to the delay by making a written demand for trial or an oral demand for trial on the record.").

¶ 89    From June 6, 2019, through December 2019, defendant filed numerous *pro se* motions. He filed a demand for a speedy trial on December 16, 2019, when he still had motions pending. The trial court resolved the last of defendant's motions on December 20, 2019. Accordingly, the 120-day speedy trial term did not recommence until December 20, 2019, when the delay occasioned by defendant expired. See 725 ILCS 5/103-5(f) (West 2018) (delay occasioned by the defendant temporarily suspends the speedy trial term, and "on the date of expiration of the delay the said period shall continue at the point at which it was suspended"). At that point, only 36 days of the speedy-trial term had elapsed, there were 84 days left, and the speedy trial term would end on March 13, 2020. The trial court properly charged defendant with the entire time period the State used to address defendant's motions and the court used to resolve each motion, from June 6, through December 20, 2019. See *People v. Bragg*, 277 Ill. App. 3d 468, 482 (1995) ("[T]he trial court properly charged the defendant with the entire time period the State used to address defendant's motions.").

¶ 90    On January 30, 2020, within the remaining speedy trial term, the State filed a motion to extend the speedy trial term in order to obtain Bhagat's return to the United States, and the court granted the motion on February 11, 2020. Afterwards, defendant filed multiple motions contesting the court's ruling up until March 10, 2020, which the court denied. His trial commenced on March 16, 2020. Defendant's continuous filing of pretrial motions that required resolution by the trial court before trial could commence further occasioned delay directly attributable to defendant. *People v. Lilly*, 2016 IL App (3d) 140286, ¶ 31 ("Any type of motion filed by defendant which

eliminates the possibility that the case could immediately be set for a trial *** constitutes an affirmative act of delay attributable to defendant."). Hence, any delay in going to trial from when defendant demanded trial on September 27, 2018, until the trial date of March 16, 2020, was directly attributable to defendant due to agreed continuances or defendant's filing of motions requiring rulings prior to trial. Those delays are not construed against the speedy trial time frame. 725 ILCS 5/103-5(a) (West 2018)).

¶ 91 Defendant argues that any discovery proceedings were not delays attributable to him, as he had a right to discovery and the necessary time to complete it. Our supreme court has indeed acknowledged that "not every motion for discovery by a defendant will constitute a delay occasioned by the defendant." *People v. Donalson*, 64 Ill. 2d 536, 541 (1976) (citing *People v. Nunnery*, 54 Ill. 2d 372 (1973)). "[A] routine discovery request will not toll the speedy trial period because, in actuality, it occasions no delay to the prosecution." *People v. Stockett*, 355 Ill. App. 3d 523, 526 (2005). Nonetheless, even with matters of discovery, our supreme court has stated that the question remains "whether the defendant's acts in fact caused or contributed to a delay," and other pretrial motions requiring a response from the State and hearing will be found charged to the defendant. *Donalson*, 64 Ill. 2d at 541-42.

¶ 92 Here, on October 26, 2018, defendant's counsel expressly requested a further date of November 5, 2018, and continued to agree to further dates until April 2019, when defendant proceeded *pro se* and filed a number of pretrial motions that required time for the State to address. As our supreme court has stated, the right to a speedy trial is "properly used as a shield against any attempt to place the defendant's trial date outside the 120-day period," but it may not be used "as a sword after the fact to defeat a conviction." *People v. Hartfield*, 2022 IL 126729, ¶ 35. The

Speedy Trial Act ((725 ILCS 5/103-5 (West 2018)) "puts the onus on a defendant to take affirmative action when she becomes aware that her trial is being delayed." *Hartfield*, 2022 IL 126729, ¶ 35. Defendant continued to agree to delays, or actively cause delays, for over a year and raised no objection to them until December 16, 2019. Given his active contribution to the delay of his trial, he cannot now use his right to a speedy trial to attack his conviction after the fact. *Id.*

¶ 93 We also find the trial court did not err in granting the State's motion to extend the speedy trial term. Section 103-5(c) of the Code (725 ILCS 5/103-5(c) (West 2018)) provides that the trial court may extend the speedy trial term by no more than 60 days, if the trial court finds the State "exercised without success due diligence to obtain evidence material to the case," and "there are reasonable grounds to believe that such evidence may be obtained at a later day." It is the State's burden to show due diligence, and "[t]he test of due diligence is whether the State began efforts to locate its witness in sufficient time to secure [his or] her presence before the speedy trial term expired." (Internal quotation marks omitted.) *People v. Ealy*, 2019 IL App (1st) 161575, ¶ 44. In reviewing the trial court's decision to grant an extension to the speedy trial term, we "examine the entire record as it existed at the time the trial court considered the motion for continuance." (Internal quotation marks omitted.) *People v. Connors*, 2017 IL App (1st) 162440, ¶ 16. We will not disturb the decision unless the trial court has abused its discretion. *Id.*

¶ 94 After several months of filing pretrial motions, defendant filed a *pro se* demand for a speedy trial on December 16, 2019. Once the trial court resolved all of defendant's motions on December 20, 2019, it granted defendant's speedy trial demand and set a trial date for February 10, 2020. By that time, there were 84 days left of the speedy trial term, which would have ended on March 13, 2020. On January 30, 2020, well within the speedy trial term, the State filed its

motion to extend the speedy trial term on the basis that Bhagat moved to India during the pendency of the case, making communication internationally more difficult and requiring he obtain a visa to enter the United States to testify. The State was unable to determine how long the DHS would take to grant Bhagat a visa. The State also asserted that Bhagat, as the victim in this case, was a necessary witness, and the State could not proceed to trial without his testimony. Based on the State's averments, the trial court did not abuse its discretion in finding the State had exercised due diligence in obtaining Bhagat's testimony and extending the speedy trial period by 60 days. See *Ealy*, 2019 IL App (1st) 161575, ¶ 49 (the trial court acted within its discretion in finding the State exercised due diligence, where the State "engaged in extensive efforts" spanning months before the end of the speedy trial window).

¶ 95                        2. Motion to Dismiss Charges

¶ 96    Finally, defendant argues *pro se* that the trial court erred in denying his motion to dismiss his charges on the basis that his case was improperly initiated by a complaint and that the complaint was defective because it was not signed by Bhagat, and for denying his motion to reconsider the denial.

¶ 97    Section 111-2(a) of the Code provides that "[a]ll prosecutions of felonies shall be by information or by indictment." 725 ILCS 5/111-2(a) (West 2018). "All other prosecutions may be by indictment, information or complaint." 725 ILCS 5/111-2(b) (West 2018). "An indictment shall be signed by the foreman of the Grand Jury." 725 ILCS 5/111-3(b) (West 2018). Where the charging instrument is a complaint, the complaint "shall be sworn to and signed by the complainant." *Id.* A peace officer may sign a complaint where the "peace officer observes the commission of a misdemeanor and is the complaining witness." *Id.*

¶ 98    Here, regardless of whether a complaint was initially filed in defendant's case and signed by a detective rather than Bhagat, defendant was prosecuted based on an indictment, and not a complaint, in compliance with sections 111-2 and 111-3 of the Code. See, *e.g.*, *People v. Rudd*, 2020 IL App (1st) 182037, ¶ 70 (noting that a felony prosecution may be commenced only by indictment or information, and a criminal complaint simply carries a limited role as a precursor to an arrest warrant). The indictment superseded any complaint (see *People v. Sandoval*, 236 Ill. 2d 57, 60 (2010)), and thus, no basis exists to dismiss the charges premised on the complaint signed by Detective Torres. The trial court therefore did not err in denying his motion to dismiss the charges, or his motion to reconsider the denial.

¶ 99                                    III. Conclusion

¶ 100   For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 101   Affirmed.