2024 IL App (1st) 221269-U

No. 1-22-1269

Order filed January 22, 2024

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 14544 |
| | ) | |
| TOBY DAVIDSON, | ) | Honorable |
| | ) | Michael Joseph Kane, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COGHLAN delivered the judgment of the court.
Justices Lavin and Pucinski concurred in the judgment.

**ORDER**

¶ 1   *Held*:  Defendant's conviction for armed habitual criminal affirmed where a rational trier of fact could find that the police officer's eyewitness testimony was reliable, credible, and supported by the physical evidence.

¶ 2   Following a bench trial, defendant Toby Davidson was convicted of armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2018)) and sentenced to 10 years' imprisonment. On appeal, defendant contends the State failed to prove him guilty beyond a reasonable doubt because the eyewitness police officer made an unreliable identification. We affirm.

¶ 3 Defendant was charged by indictment with one count of armed habitual criminal, two counts of unlawful use or possession of a weapon by a felon, and two counts of aggravated unlawful use of a weapon.

¶ 4 At trial, Chicago police officer Szul[1] testified that about 8:20 p.m. on September 28, 2019, he heard gunshots approximately half a block from his location at the corner of 78th Street and Phillips Avenue. Szul reported the gunshots via police radio and, with his partner, drove east toward the direction of the shots on Essex Avenue. Shortly before arriving at Essex, Szul observed people running from the area from which he perceived the gunshots. He also learned from individuals on scene that a silver vehicle fleeing westbound on 78th was involved in the shooting. Szul's partner relayed the description and location of the vehicle over police radio. The State introduced footage from Szul's squad car camera which, according to Szul, depicted a silver Dodge Journey SUV pass his squad vehicle heading westbound on 78th toward Luella Street.[2]

¶ 5 On cross-examination, Szul agreed that he did not know the Dodge Journey may have been involved in the shooting when it passed his squad car. On redirect examination, Szul stated that he relocated to 78th and Luella where defendant was removed from a silver Dodge Journey. On recross-examination, Szul acknowledged that while he drove past the silver Dodge, he could not see the faces of the occupants or determine how many occupants were inside the vehicle.

¶ 6 Chicago police sergeant Marvin Coleman testified that on September 28, 2019, at about 8:20 p.m., he heard over the radio that shots were fired and that a silver four-door SUV driving

---

[1] Officer Szul's first name does not appear in the record.

[2] The record on appeal contains a disk with a video file purporting to be the footage from Szul's squad car camera. This court has viewed the video, which is not the footage published at trial. Based on the record, however, that footage is not dispositive of the issue on appeal and does not impact our ability to resolve this appeal.

westbound on the 7800 block of South Yates Boulevard was involved. Coleman was working alone, driving an unmarked police vehicle, and had not been assigned a body-worn camera. After hearing the dispatch, Coleman drove westbound on 79th Street where a silver four-door SUV approached him from Luella driving the wrong way down a one-way street. When Coleman drove toward the SUV, it reversed and conducted a three-point-turn. Coleman activated his lights and spotlight and conducted a traffic stop of the SUV on Luella. Coleman immediately relayed a description of the vehicle and its location via police radio; however, he did not realize which cross street he was on, so he gave an inaccurate location to the Office of Emergency Management and Communication (OEMC).

¶ 7     As he exited his squad vehicle, Coleman drew his firearm. Once outside his vehicle, Coleman gave verbal commands to the four occupants of the SUV and maintained contact with OEMC to direct backup officers to his location. With his spotlight shining on the back of the SUV, Coleman observed the occupant seated in the rear passenger seat extend his hands outside the window and toss a handgun. That firearm landed in the grassy parkway approximately five feet away from the SUV. Coleman's squad car was positioned five to seven feet behind the SUV, and he was standing a few feet behind the front of his vehicle in the open driver's side door with a clear line of sight to the passenger side of the SUV. Based on Coleman's vantage point, he could see into the SUV through its open windows with the assistance of his headlights, spotlight, and the streetlights.

¶ 8     After the handgun was thrown out the rear passenger window, the occupants of the vehicle kept their hands outside the vehicle as Coleman, and shortly thereafter assisting officers, continually gave verbal commands to "let me see your hands" and "[k]eep your hands visible."

Coleman then observed the individual in the front passenger seat extend his hands outside the window and throw another handgun. The second handgun landed on the sidewalk, which Coleman determined by the sound of metal hitting concrete.

¶ 9    Chicago police officers Diana and Kudzia[3] were the first assisting officers to arrive on scene. Once those officers approached, Coleman walked around his squad vehicle to position himself closer to the handguns outside the SUV. Coleman directed the assisting officers to remove the occupants of the SUV one at a time. In court, Coleman identified defendant as the individual who had tossed the first handgun out the rear passenger window. Once on the passenger side of the SUV, Coleman observed what he learned was a loaded .45-caliber Ruger handgun in the grassy parkway where defendant tossed the first handgun. He further observed a two-tone semiautomatic handgun on the sidewalk where the front seat passenger tossed the second handgun. The State introduced the .45-caliber Ruger handgun into evidence, which Coleman identified as the weapon he saw exit defendant's hands from the rear passenger window.

¶ 10    The State introduced Diana's body-worn camera footage. This court viewed Diana's video, which depicts the scene and much of the events described in Coleman's testimony. In the video, Coleman stands in the driver's door wedge of his vehicle with his weapon drawn telling the occupants of the SUV to keep their hands visible out the four open windows. At first, Coleman does not look in the assisting officers' direction when they arrive on scene because he is looking at the SUV and issuing continuous verbal commands for the occupants to keep their hands visible. The assisting officers draw their weapons and also command the SUV occupants to show their hands. Coleman takes three to four seconds to walk around his squad car to the passenger side.

_____

[3] Officers Diana and Kudzia's first names do not appear in the record.

During this time period, the hands of at least three of the SUV occupants can be seen outside the open windows. It is unclear from the video whether the rear passenger's hands remain outside the SUV during that three to four second period, but the three other occupants of the SUV do not change their positions in the vehicle.

¶ 11    The State also introduced body-worn camera footage from Chicago police officer Patrick Wilkison, whom Coleman directed to recover the Ruger handgun. This court viewed the video, which depicts Wilkison recovering the Ruger from the parkway next to the SUV while wearing gloves and unloading the loaded magazine and the live round from the chamber. A two-tone handgun is visible on the sidewalk.

¶ 12    On cross-examination, Coleman stated that his vehicle's front bumper was situated five to seven feet behind the SUV. He agreed that he was positioned behind the hood of his vehicle which was approximately four feet from the bumper. Coleman observed the SUV from an angle while positioned in his door wedge but could see through the rear window of the SUV by the artificial lighting on the street in addition to his headlights and spotlight, which made it "pretty well-lit." Coleman acknowledged that he could not see the faces of the occupants of the SUV while behind it and when the handguns were thrown from the windows. The artificial street lighting also helped Coleman see the weapons on the parkway and sidewalk. Coleman agreed that the rear window of the SUV was "darker than clear glass."

¶ 13    Upon questioning by the trial court, Coleman agreed that, after throwing the firearms, each set of hands stayed outside the windows of SUV. The occupants of the vehicle were "compliant" when he commanded to see their hands. Additionally, from the time Coleman started describing

the wrong location over police radio to the time that other police officers arrived, less than five or six minutes had elapsed.

¶ 14    The State introduced a certified copy of defendant's conviction for unlawful use or possession of a weapon by a felon under case number 12 CR 1063601. The parties stipulated that defendant had previously been convicted of armed robbery under case number 15 CF 998 in Kane County.

¶ 15    Following closing arguments, the trial court found the evidence established defendant knowingly possessed the Ruger firearm where the testimony of the two witnesses and the video evidence all showed that defendant extended his hands out the rear passenger window, threw the Ruger out that window, and kept his hands outside that window until he exited the SUV from the rear passenger seat. The trial judge noted that "Sgt. Coleman was maybe the most credible witness" the court had "seen in some time."

¶ 16    Moreover, the trial judge concluded, "[t]hose hands went out that window and they never came back inside" because officers "were screaming" for the vehicle's occupants to " 'keep your hands visible' which makes sense because when police can't see hands, people get shot." Accordingly, the trial court found defendant guilty of armed habitual criminal, two counts of unlawful use or possession of a weapon by a felon, and two counts of aggravated unlawful use of a weapon. The counts for unlawful use or possession of a weapon by a felon and aggravated unlawful use of a weapon merged into the armed habitual criminal count.

¶ 17    Defendant filed a motion for a new trial. At a hearing, defendant argued that Coleman could not have seen defendant throw the weapon out of the vehicle with multiple occupants in it. The

trial judge stated that he found Coleman "extremely credible" and that his testimony was "uncontradicted." The trial court denied the motion.

¶ 18    Following a hearing, defendant was sentenced to 10 years' imprisonment. Defendant did not file a motion to reconsider his sentence.

¶ 19    On appeal, defendant contends the State failed to prove him guilty beyond a reasonable doubt of possessing the firearm because Coleman's identification was unreliable. Defendant first argues that Coleman had poor viewing conditions where he observed the passenger side of the SUV from an angle, while in the wedge of his squad car, through tinted windows, at night, and that Coleman lost sight of the SUV at one point to walk around his squad car. He further argues that Coleman's degree of attention was poor because of the high stress of a solo traffic stop of four occupants in a vehicle suspected to be involved in a nearby shooting and the fact that weapons were present. He argues the stress caused Coleman to give an inaccurate street name to backup officers. Defendant contends Coleman could not reliably say that defendant and not another occupant of the vehicle tossed the handgun out the window.

¶ 20    The State responds that the evidence established defendant knowingly possessed the firearm where Coleman's identification was reliable, credible, and supported by evidence including footage.

¶ 21    As an initial matter, defendant posits that this court should review his case *de novo* because "[w]hether the State proved a defendant guilty beyond a reasonable doubt is a question of law, which is reviewed *de novo*." We disagree. Defendant's sufficiency arguments are based on the credibility and reliability of witnesses, which is the province of the trial court. *People v. Padilla*, 2021 IL App (1st) 171632, ¶ 42.

¶ 22    Where a defendant challenges the sufficiency of the evidence to sustain his conviction, the question for the reviewing court is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228-29 (2009). This standard applies whether the evidence is direct or circumstantial. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). Under this standard, all reasonable inferences from the evidence must be allowed in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42.

¶ 23    The credibility of the witnesses, the weight to be given their testimony, the resolution of any conflicts in the evidence, and the reasonable inferences to be drawn from the evidence are within the province of the trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact on these matters. *People v. Gray*, 2017 IL 120958, ¶ 35. Because the trial court has the best opportunity to observe the demeanor and conduct of the witnesses, it is in the best position to determine the credibility and weight to be given to the witnesses' testimony. *Siguenza-Brito*, 235 Ill. 2d at 224. In weighing the evidence, the fact finder is not required to disregard the inferences that naturally flow from that evidence, nor must it search for any possible explanation consistent with innocence and raise it to the level of reasonable doubt. *Jackson*, 232 Ill. 2d at 281. A reviewing court may not retry the defendant. *In re Q.P.*, 2015 IL 118569, ¶ 24. Testimony will only be found insufficient where the record "compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). A defendant's conviction will be reversed only if the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *People v. Wright*, 2017 IL 119561, ¶ 70.

¶ 24    To prove defendant guilty of armed habitual criminal, the State was required to show that he intentionally or knowingly possessed the .45-caliber Ruger firearm, after having been convicted of two qualifying felonies. (720 ILCS 5/24-1.7(a) (West 2018)). Defendant does not dispute that his prior convictions for armed robbery and unlawful use or possession of a weapon by a felon were qualifying convictions for armed habitual criminal. Nor does he contest the element of possession. Instead, defendant argues the State failed to establish his identity as the offender.

¶ 25    "The credibility of identification witnesses and the weight accorded their testimony lie within the province of the trier of fact." *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 30. "Where the identification of defendant constitutes the central question in a criminal prosecution, the testimony of even a single witness is sufficient to convict where the witness is credible and viewed the accused under conditions permitting a positive identification to be made." (Internal quotation marks omitted.) *Id*.

¶ 26    Viewed in the light most favorable to the State, the evidence was sufficient for the trial court to find defendant possessed the Ruger handgun when he threw it out the rear passenger window of the Dodge Journey. Sergeant Coleman, whom the trial court found credible, testified that he had a clear line of sight to the occupants of the SUV, the scene was well lit, and he saw defendant throw the firearm out the window of the SUV. Coleman's testimony, standing alone, is sufficient to establish that defendant possessed the firearm. See *Id*. Further, Coleman's testimony was corroborated in large part by Szul's testimony, the body-worn camera footage, and the location where the firearm was recovered. The evidence was sufficient to prove defendant guilty of armed habitual criminal.

¶ 27    Nevertheless, defendant challenges the reliability of Coleman's identification.

¶ 28    Both parties cite *Neil v. Biggers*, 409 U.S. 188 (1972), to evaluate whether a witness's identification testimony is reliable. *Biggers* addressed the factors to be considered in evaluating the likelihood of misidentification after an allegedly suggestive confrontation procedure. *Id*. at 199-200. There was no such confrontation procedure here.

¶ 29    However, this court has used the *Biggers* analysis to evaluate the reliability of witness identification testimony absent allegations of unduly suggestive identification procedures. See, *e.g.*, *People v. Woodson*, 2023 IL App (1st) 191353, ¶ 70-71. Under *Biggers*, courts look to five factors to determine whether a witness's identification is reliable: (1) opportunity to view the offender at the time of the crime; (2) degree of attention; (3) accuracy of the prior description; (4) level of the certainty demonstrated at the identification confrontation; and (5) the length of time between the crime and identification. *Biggers*, 409 U.S. at 199-200.

¶ 30    The first *Biggers* factor to be considered when analyzing the reliability of an identification is a witness's opportunity to observe the offender during the offense. *Id.* Coleman testified regarding the circumstances surrounding his ability to see defendant, defendant's hands, the handgun defendant threw out the window, and that he had a clear line of sight to the rear passenger window. The record reflects, and the video evidence corroborates, that Coleman's headlights and spotlight were directed at the back of the SUV with additional street lighting illuminating the area. The windows of the SUV were all open, which further substantiates Coleman's testimony that he could see through the back passenger window from nine to eleven feet away. When backup officers arrived, Coleman was depicted on video standing in the wedge of his door with his attention directed toward the SUV.

¶ 31    The only evidence to suggest there was a period of time when Coleman looked away from the SUV was for the three to four seconds when he turned and walked to the other side of his squad car. By that time, assisting officers were already on scene walking toward the two vehicles also giving the same verbal commands as Coleman for the occupants to continue keeping their hands visible. Additionally, the record reflects that all occupants of the vehicle had their hands extended out the windows by the time Coleman turned, and there was no evidence of movement inside the SUV. To the contrary, Coleman testified that once the SUV stopped, the occupants were "compliant" with his commands to keep their hands visible. This three to four second period when Coleman turned around was *after* the handguns had been tossed and did not hinder Coleman's view of defendant throwing the handgun out the window. Moreover, defendant is seen, both by Coleman and on video, exiting the rear passenger seat of the SUV not more than five feet away from where the Ruger was recovered after he threw it.

¶ 32    Further, Coleman had a sufficient degree of attention on the SUV and its occupants to satisfy the second *Biggers* prong. *Id*. Witness testimony that is descriptive and can be verified with other evidence satisfies the degree of attention needed for a witness to be reliable. *Petermon*, 2014 IL App (1st) 113536, ¶ 32-33. Here, Coleman had knowledge that the SUV he stopped while working alone was likely involved in a nearby shooting. Then, he observed defendant and the front seat passenger throw handguns out the windows of the vehicle. A rational trier of fact could infer that Coleman's attention was primarily directed at that SUV and those occupants' hands because his safety was in jeopardy.

¶ 33    Coleman's degree of attention can be verified by the body worn camera video which shows him not even look in the assisting officers' direction when they first arrive on scene because he is

focused on the SUV and issuing continuous verbal commands for the occupants to keep their hands visible. Once he knew he had backup, Coleman directed assisting officers to remove the occupants from the SUV one at a time while he moved closer to the handguns on the passenger side. Defendant is seen exiting from the rear passenger seat, and Wilkison is later seen on video recovering a .45-caliber Ruger handgun from the grassy parkway where Coleman described it being thrown. The video and physical evidence corroborate the description and detail in Coleman's testimony and confirm his attention to detail on scene.

¶ 34     The third *Biggers* prong is uncontested by the parties. Similarly, defendant acknowledges that Coleman did not express doubt in his identification of defendant and agrees that the time period between the shooting and Coleman's confrontation with defendant would favor Coleman's identification, which establish the fourth and fifth *Biggers* prongs.

¶ 35     Viewing all this evidence in the light most favorable to the State, defendant was properly proven guilty beyond a reasonable doubt of armed habitual criminal. Accordingly, we find no basis to disturb the trial court's judgment.

¶ 36     For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 37     Affirmed.